[No. 12941. In Bank. — November 30, 1889.]

## IN THE MATTER OF THE ESTATE OF GERSHOM P. JESSUP, DECEASED.

ESTATES OF DECEASED PERSONS — PARTIAL DISTRIBUTION — CONTEST OF HEIRSHIP — ADOPTION OF ILLEGITIMATE CHILD — JURISDICTION. — The superior court has jurisdiction, upon petition for the partial distribution of an estate under sections 1658 and 1659 of the Code of Civil Procedure, to determine a question of contested heirship or right to inherit, though the right is claimed by reason of the adoption of an illegitimate child of the deceased, without a prior determination of that right under section 1664 of the Code of Civil Procedure. (FOX, J., holding *contra.*)

ID. — STATEMENT OF COUNSEL — ADMISSION OF PATERNITY. — A statement of counsel upon the trial of a contest of heirship, to the effect that he supposed the court would find in favor of the petitioner upon the issue of paternity, in view of the rulings already made and given, does not constitute a binding admission of the fact of paternity.

ID. — EVIDENCE — PATERNITY — IDENTITY. — When a witness has testified to the admission of the deceased that he was the father of a boy, and had shown him the boy, who bore some marks of resemblance to the petitioner, it is not harmful error to inquire further of the witness as to the identity of the petitioner with such boy, in reference to marks of resemblance and reminder, for the purpose merely of proving such identity.

ID. — INTENTIONS OF DECEASED. — Evidence as to the intentions of the deceased toward the mother of his illegitimate child is irrelevant and incompetent for the purpose of showing adoption of the child, but it is not prejudicial error to admit such evidence upon the issue of paternity, though its tendency may be to show that there was no intention to adopt the child.

ID. — LETTERS OF MOTHER OF ILLEGITIMATE CHILD. — The letters from the mother of an illegitimate child to its nurse are incompetent and inadmissible for the purpose of proving paternity, but are admissible to show her acquiescence in the disposition made of the child by the deceased.

ID. — PHOTOGRAPHS. — A photograph of the deceased, taken many years before the trial of the contest as to heirship, is irrelevant and inadmissible. A photograph of the deceased and petitioner, made shortly before the trial by bringing two negatives in juxtaposition, and from them making a third, may perhaps be admissible to show resemblance between the two, as bearing upon the question of paternity, but would be entitled to very little weight in view of frequent marked resemblances between strangers, and great dissimilarity between kindred.

ID. — CHRISTENING OF ILLEGITIMATE CHILD. — The deposition of a clergyman as to the christening of an illegitimate child by the family name of the deceased without his presence, at the request of the child's nurse, is not admissible to prove anything binding on the deceased, but is admis-

sible to corroborate, as to the fact of christening, the testimony of the nurse, who testified that such christening was done at the request of deceased.

ID. — CONSTRUCTION OF STATUTES AS TO ADOPTION OF ILLEGITIMATE CHILDREN — RETROSPECTIVE OPERATION. — The statutes of 1850 and 1870, in reference to the adoption of illegitimate children, are to be strictly construed, as being in derogation of the common law; nor can the act of 1870 or the Civil Code be construed as retroactive, so as to give force or effect to acts done or performed before its passage which they would not have had at the time they were done or performed. The code provisions on that subject are to be liberally construed; but liberal construction does not require or authorize the enlargement or restriction of the written law. (WORKS, J., BEATTY, C. J., and PATERSON, J., dissenting, hold that all the provisions of the various statutes should have a strict construction on the single question of paternity, but should all have a liberal construction as to the question of adoption; and that prior acts and conduct, while not retroactively allowed to constitute an adoption under a later statute, should, if continuous, be taken into account in determining whether there was an adoption under the later statute, taking into consideration the whole conduct of deceased toward and his treatment of the child.)

ID. — CONSTRUCTION OF CODE — ADOPTION — RIGHT OF INHERITANCE. — Section 230 of the Civil Code relates only to the legitimizing of minor illegitimate children, and confers a right of inheritance as the result of adoption, while section 1387 of the same code provides for giving illegitimate adults the capacity of inheritance, and forms no limitation upon or qualification of section 230.

ID. — PUBLIC ACKOWLEDGMENT OF ILLEGITIMATE CHILD. — The public acknowledgment of an illegitimate child required by section 230 of the Civil Code, in order to adopt and legitimize it as the heir of its father, who is unmarried, requires that he should hold the child out to his relatives, friends, acquaintances, and the world, and acknowledge and treat it as his child in such family as he may have, and otherwise treat it as if it were a legitimate child. The evidence in this case held insufficient to establish such acknowledgment or adoption of the petitioner by the deceased. (WORKS, J., PATERSON, J., and BEATTY, C. J., dissenting, hold that the statute is only intended to require certain proof of acknowledgment of the child by a sufficient number of witnesses to establish the fact, and that the child be treated as legitimate for purposes of protection, maintenance, and education; that while the most satisfactory way of establishing the necessary facts is by proof that the claimant has been received into the family and given the family name, this is not necessary where there is sufficient proof of a reason for not having done either, such as appears in this case, and that the evidence is sufficient to establish the petitioner's adoption and right to inherit.)

REHEARING — STARE DECISIS. — The power of this court to grant rehearings by orders of the court entered upon its minutes, without the written signatures of five justices, must be affirmed upon the principle of *stare decisis*. (WORKS, J., dissenting.)

ID. — POWER OF LEGISLATURE — CONSTITUTIONAL LAW — JURISDICTION OF
SUPREME COURT. — Section 45 of the Code of Civil Procedure, requiring
that an order granting a rehearing after judgment of the court in Bank
shall be in writing signed by five justices, is unconstitutional.   The juris-
diction of the supreme court is derived from the constitution, and can
neither be enlarged nor abridged by the legislature.   The court has power
to act by a constitutional majority of its members in all cases where the
constitution confers power upon it, and the legislature cannot in any
case require the concurrence of more than such majority.   The court in
Bank may by its order grant rehearings in cases decided by it, by virtue
of its appellate jurisdiction and its inherent power as an appellate court
to revise, modify, and ·correct its judgments, so long as they are under
its control.   Such power is an essential ingredient of jurisdiction, and
ends only with the loss of jurisdiction, by the regular issuance of a re-
mittitur.   (WORKS, J., dissenting.)

ID. — CONSTRUCTION OF CONSTITUTION. — The express provision of the con-
stitution as to the granting of rehearings in Bank after decision by a
Department does not create an implication against the constitutional
power of the court in Bank to grant a rehearing of cases determined by
it.   (WORKS, J., dissenting.)

APPEAL from a judgment of the Superior Court of the
city and county of San Francisco, and from an order
denying a new trial.

The facts are stated in the opinion of Mr. Justice Fox.

*John H. Dickinson, McAllister & Bergin, John Garber,*
and *Thomas J. Bowers,* for Appellants.

The court had no jurisdiction to hear the petition for
partial distribution, in the case of a contested heirship
of an illegitimate child, without prior determination of
the right to inherit.   (Code Civ. Proc., sec. 1664.)   The
court erred in allowing the witness Winter to answer as
to points of resemblance between petitioner and Gershom
P. Jessup.   (*Young* v. *Makepeace,* 103 Mass. 54; *Eddy* v.
*Gray,* 4 Allen, 435; *Keniston* v. *Rowe,* 16 Me. 38; *Hana-
walt* v. *State,* 64 Wis. 84; 54 Am. Rep 588; *Petrie* v.
*Howe,* 4 Thomp. & C. 86; *People* v. *Carney,* 29 Hun, 49;
*Jones* v. *Jones,* 45 Md. 151–153.)   The court erred in ad-
mitting letters between third parties not communicated
to deceased.   (Code Civ. Proc., secs. 1848, 2054; *People*

v. *Stevens*, 52 Cal. 458; Starkie on Evidence, 59 et seq.;
*Hildreth* v. *Shepard*, 65 Barb. 269; *Winslow* v. *Newlan*,
45 Ill. 150.)   The court erred in admitting the photo-
graphs of Jessup.   (*Jones* v. *Jones*, 45 Md. 152.)   The
court erred in admitting the deposition as to the baptism
of petitioner, without a showing of diligent search to
obtain the record.   (Code Civ. Proc., sec. 1855.)   The
evidence does not justify the decision.   All the evidence
is consistent with an avowed, manifested, and maintained
purpose not to acknowledge or legitimize.   (*Estate of
Sbarboro*, Myrick, 258; *Estate of Briswalter*, 72 Cal. 108;
*Estate of Pico*, 52 Cal. 84; *Yardley's Estate*, 75 Pa. St. 211;
*Morgan* v. *Perry*, 51 N. H. 560; *Brown* v. *Belmarde*, 3
Kan. 46, 53; *McCullough's Estate*, 6 Ala. 254; *Com.* v.
*Wardell*, 128 Mass. 52; *Zimmerman* v. *Franke*, 34 Kan.
654; *Rice* v. *Com.*, 101 Pa. St. 32; *Weatherford* v. *Weather-
ford*, 20 Ala. 548; 56 Am. Dec. 206; *Hartinger* v. *Ferring*,
24 Fed. Rep. 17; *Race* v. *Oldridge*, 90 Ill. 250; 32 Am. Rep.
27; 1 Freeman on Executions, 2d ed., sec. 222; *Bamm*
v. *Bamm*, 42 Md. 297; *Cross* v. *Cross*, 55 Mich. 280;
*Powers* v. *Charmbury*, 35 La. Ann. 630.)   The statutes of
adoption are in derogation of the common law.   (*Wallace*
v. *Rappleye*, 103 Ill. 229; *Eckford* v. *Knox*, 67 Tex.
200; Schouler on Domestic Relations, 232; *Estate of
Sandford*, 4 Cal. 13; *Pina* v. *Peck*, 31 Cal. 362, 363.)
Consent of the mother of an illegitimate child is necessary
to an adoption by its father.   (Civ. Code, secs. 224, 226,
*Luppie* v. *Winans*, 37 N. J. Eq. 245; 5 Wait's Actions
and Defenses, p. 49.)   Section 1387 is a limitation upon
section 230 of the Civil Code, as to heirship, which does
not follow from mere adoption.   (*Smith* v. *Kelly*, 23
Miss. 167; 55 Am. Dec. 87.)   The public acknowledg-
ment must be general and notorious to constitute an
adoption under section 230.   (Webster's Dictionary,
definition of "Public"; Rapalje's Law Dictionary,
"Public"; *Sharon* v. *Hill*, 11 Saw. 382; *Estate of Bris-
walter*, 72 Cal. 108; *Estate of Blasini*, 30 La. Ann.,

pt. 2, 1393, 1397; *Powers* v. *Charmbury*, 35 La. Ann. 634; *Barnum* v. *Barnum*, 42 Md. 297; *Weatherford* v. *Weatherford*, 20 Ala. 554; 56 Am. Dec. 206.) The testimony as to the oral declarations of the deceased is of trifling value. (*Lea* v. *Polk County Copper Co.*, 21 How. 504; *Miller* v. *Cotten*, 5 Ga. 349, 350; *Davis* v. *Davis*, 26 Cal. 43; 85 Am. Dec. 157; *Haven* v. *Markstrum*, 67 Wis. 493; 1 Taylor on Evidence, sec. 648; *Crouch* v. *Hooper*, 16 Beav. 184–186; *Webb* v. *Haycook*, 19 Beav. 345–347.) Recognition of the fact of paternity does not prove adoption. (*Estate of Sbarboro*, Myrick, 255, 256.) Nothing which occurred prior to March 31, 1870, can count as evidence of adoption, and only acts since the adoption of the code can be considered as respects adoption under it. (*Morgan* v. *Perry*, 51 N. H. 560; *Brown* v. *Belmarde*, 3 Kan. 46, 53; *Estate of Pico*, 52 Cal. 86; *Hartinger* v. *Ferring*, 24 Fed. Rep. 17.)

*Henry I. Kowalsky, W. H. L. Barnes,* and *Morris C. Baum,* for Respondent.

The law favors the illegitimate child, and not the father, and statutes for legitimation are humane, and should have a most liberal construction. (*Hunt* v. *Hunt*, 37 Me. 333; *Richards* v. *Dogget*, 4 Mass. 534; *Dickinson's Appeal*, 42 Conn. 509; 19 Am. Rep. 553; *Crane* v. *Crane*, 31 Iowa, 296; *Margrove* v. *Freeman*, 12 Ga. 342; *Brown* v. *Belmarde*, 3 Kan. 41; *Miller* v. *Miller*, 91 N. Y. 315; 43 Am. Rep. 669; *Smith* v. *Kelly's Heirs*, 23 Miss. 167; 55 Am. Dec. 87; *Succession of Caballero*, 24 La. Ann. 573; *Simmons* v. *Bull*, 21 Ala. 501; 56 Am. Dec. 261, note.) Personal *status* once fixed by adoption remains unalterable. (*McGunnigle* v. *McKee*, 77 Pa. St. 81; 18 Am. Rep. 428; *Hosser's Succession*, 37 La. Ann. 839; *Lessee of Brewer* v. *Blougher*, 14 Pet. 178; *Taurons* v. *Campbell*, 74 Pa. St. 470; *Morse* v. *Welton*, 6 Conn. 551; 16 Am. Dec. 73; *Torrington* v. *Farish*, 21 Conn. 548.) A public communication may be made to a second or other per-

son, or to a greater number. (*Grigsby* v. *Breckenridge,*
2 Bush, 507; *King* v. *Burdett,* 4 Barn. & Adol. 412; *Eg-
bert* v. *Lipman,* 104 U. S. 333.) The deceased had no
family. A family is a collection of individuals bound
together by legal and moral ties. (*Howard* v. *Marshall,*
48 Tex. 471; *Whitehead* v. *Nickerson,* 48 Tex. 517; *Strawn*
v. *Strawn,* 53 Ill. 263; *Wilson* v. *Corchoran,* 31 Tex. 677.)
Adoption of an illegitimate child carries with it the
right of inheritance. (Civ. Code, sec. 230; *Harvey* v.
*Browne,* 32 Ind. 89.)

Fox, J.—Gershom P. Jessup died in this state on the
second day of November, 1886, leaving a last will and
testament, dated August 28, 1867, and being at the time
of his death a resident of the city and county of San
Francisco. The will was admitted to probate November
22, 1886, and letters testamentary issued to S. O. Put-
nam and Isaac Jessup, the executors therein named.
He was never married, and his entire estate, amounting
to nearly one hundred thousand dollars, was devised to
his brother, Isaac Jessup, and his two sisters, Mrs. Ann
A. Lindsley and Mrs. Caroline O. Bogart, the two latter
of whom were and are non-residents of this state.

On the eleventh day of April, 1887, the petitioner,
respondent here, describing himself as Richard P. Jes-
sup, but signing as Richard Jessup, and who is subse-
quently shown to have been usually known as Richard
Miller, filed his petition in the said case in probate, in
which, after setting out the preliminary facts showing
the death and pendency of the probate proceedings, and
showing the character and condition and amount of the
estate, he avers substantially that he is a son of said
Gershom P. Jessup, deceased, and of Josie Landis, de-
ceased; that he was born in San Francisco March 20,
1866; that said Gershom P. Jessup and Josie Landis
never intermarried nor lived together as husband and
wife, but that from and after the birth of said petitioner,

and for many years subsequent thereto, and up to the time of the death of said Gershom P. Jessup, he, the said Gershom P. Jessup, publicly acknowledged the petitioner as his child, and supported, maintained, and educated him as such, and otherwise and in all ways treated the petitioner as if he were a legitimate child; "and did thereby adopt your petitioner as and for his legitimate child, and thereby and thenceforth your petitioner became for all purposes the legitimate child of the said Gershom P. Jessup, from the time of your petitioner's birth." It further sets out that said Gershom P. Jessup was never married and never had any family residence; that by an omission not appearing to be intentional, he wholly omitted to provide in his will for petitioner, and claims that by reason thereof petitioner is entitled to the same distributive share in the estate of deceased as though said deceased had died intestate; and then proceeds to set out that the estate is but little indebted, and prays an order of court, after due notice and hearing, distributing the whole of the estate, or such part thereof as the court shall direct, to petitioner, upon his giving bond conditioned for the payment, whenever required, of his proportion of the debts of the estate.

Under this petition citation was issued to the executors of the will only, and served on the same day. Subsequently the executors appeared and demurred to the petition: 1. For want of facts to entitled the petitioner to partial distribution; 2. Repeating the same ground in another form; 3. For uncertainty, which was duly specified; 4. That the court had no jurisdiction of the subject-matters contained in the petition; 5. For defect and misjoinder of parties, in that the devisees under the will were not joined; 6. That the court had no jurisdiction of the person or any person interested in and necessary to the determination of the questions presented in the petition; 7. That the petitioner had no legal

capacity to petition for partial or any distribution, and setting forth the reasons therefor.

This demurrer was afterward overruled and exception taken, and the ruling is assigned as one of the errors relied upon on this appeal.

The executors then answered, putting in issue the question of the paternity of the petitioner, and the question of his adoption. On the issue thus framed, a trial was had before the court, and a large amount of testimony was taken. The court found in favor of the petitioner, and gave judgment ordering the distribution of the entire estate to him, upon his giving bond in the sum of one thousand dollars, which was given, conditioned that he would, when required, pay any debts that might be found due from the estate.

From this decision and judgment or order an appeal is taken to this court, both on questions of law and on the ground of insufficiency of the evidence to justify the decision, the evidence being brought up in a bill of exceptions.

Twenty-three specifications of errors of law are assigned, six of which go to the question of jurisdiction. Personally, I am of opinion that the court never acquired jurisdiction to hear and determine the questions involved in this appeal; that upon petition for partial distribution, jurisdiction to determine the question of contested heirship, or right to inherit, can only be acquired by proceeding as provided in section 1664 of the Code of Civil Procedure. But in this a constitutional number of the justices of the court do not agree with me, and the ruling of the court is in favor of sustaining the ruling of the court below, in so far as relates to the question of jurisdiction.

The remaining specifications of errors of law relate mostly to certain rulings of the court upon the admission and exclusion of evidence. Counsel for respondent contend that these rulings, even if erroneous, were

harmless, for the reason that most of such rulings relate to evidence tending to show that the respondent was the son of the deceased, and that this fact was admitted by counsel in the court below. By an amendment of the record, that which is claimed to have been an admission so made by counsel has been brought to this court. We do not agree with counsel that it is an admission which should be held binding upon the parties, as to the existence of the fact. At most, it was a mere expression of opinion of counsel as to what he supposed the court would find in view of the rulings already made and given, not as an admission of the fact, but as a reason why he need not dwell longer upon that point. The fact of paternity is denied even here, and it is the first of the questions of fact which will have to be determined in any proceeding which the respondent may prosecute for the purpose of asserting his claim to inheritance.

As to the particular question put to the witness Winter, and objected to, it may be said: For the avowed purpose for which the question was put, it was, to say the least, harmless to admit it. The witness had already testified to the fact that the deceased had admitted to him the paternity of a boy and shown him the boy. The point of inquiry at the moment of the question objected to was the identity of the young man to whom his attention was then called in court with the boy so shown to him some years before, and the witness had himself spoken of marks of resemblance between the person so before him in court and the deceased, and which marks of resemblance had attracted his attention on the former occasion, and it was in reference to these marks of resemblance and reminder that the question was put; the counsel declaring that the question was not put for the purpose of proving paternity, but simply of identity.

We cannot see that it was prejudicial error to allow the question put to Mrs. Hatton, as to the conversations

had between herself and the deceased, at any time during the last six or seven years, in regard to the intentions of the deceased toward Richard's mother. The question was entirely irrelevant and incompetent for the purpose of showing adoption, but it was undoubtedly put in the hope of eliciting further evidence tending to show paternity. It was a dangerous question for the respondent to put, for paternity alone, even if admitted, would not give a right of inheritance, and if the response proved an intention to make any other arrangement than that of marriage (an arrangement which counsel evidently did not expect and did not prove), its tendency was, and evidently must have been, to show that whatever the deceased had done for the boy was done for some reason other than that of an intent to adopt.

We do not perceive that it was prejudicial error to admit petitioner's exhibits A, B, C, D, E, F, G, and H, the letters of Mrs. Landis to Mrs. Nugent. They were incompetent and inadmissible for the purpose of proving paternity, but they were not offered for such a purpose. The sole object of introducing them was to show that at that time the child's mother acquiesced in the disposition that was being made of, and the provision that was being made for, the child. For that purpose the letters were admissible, although perhaps not very material, it being borne in mind that this was prior to the passage of the act of 1870.

Exhibit K, the photograph of the deceased, taken ten or twelve years ago, was entirely irrelevant and immaterial to any issue in the cause, and the objection to its introduction should have been sustained. Its admission was, however, probably a harmless error.

Exhibit L was a photograph showing the deceased and the petitioner in the same picture. It was made shortly before the trial, by bringing two negatives in juxtaposition, and from them making a third. One of them, that

of the petitioner, was made from life at the time; the
other was an old negative, made several years before.
The admitted purpose of the introduction of this picture
was to show the resemblance of the two persons, as a fact
tending to prove paternity.   Mere opinion as to resem-
blance between a child and its putative father is not
admissible in evidence, but the fact of resemblance is
held to be some evidence tending to prove paternity,
and so when the child and the alleged father have both·
been present, it has been held permissible to place them
side by side before the jury for the purpose of letting
them draw their own deductions as to the fact of resem-
blance.   (*Gilmanton* v. *Ham*, 38 N. H. 108.)   We are not
prepared to say that pictures taken by the improved
processes of photography may not be admissible for such
a purpose; but they would be entitled to much less
weight as evidence than profert of the persons them-
selves, and even the latter would not go far toward es-
tablishing relationship, since a marked similarity between
strangers, and great dissimilarity between kindred, are
matters of almost daily observation.   (See 1 Wharton
on Evidence, sec. 346.)

We do not think the exception taken to the admission
of the deposition of the clergyman Ward, as a whole, was
well taken.   Taken by itself, that deposition would not have
been admissible as proving, or tending to prove, anything
binding upon the deceased; but taken in connection with
the testimony of Mrs. Hatton, it was admissible as cor-
roboratory of her testimony in relation to the fact of the
christening.

Errors are also assigned as to some other rulings of
the court in the admission and exclusion of evidence,
but we do not deem them of sufficient importance to
merit special consideration here.

The only remaining point upon this appeal which it
is necessary for us now to consider is, that " the evidence
is insufficient to justify the decision."

The evidence is voluminous, and at the first reading seems conflicting. But when we have first examined the law and ascertained and determined what facts are necessary to be established by proof, in order to determine that an illegitimate child has been legitimized and given the capacity of inheritance in the estate of the father, the apparent conflict is removed; and upon some at least of the points so necessary to be established by proof we find that there is not only no conflict, but no evidence whatever, to bring the case within the requirements of the law.

All the rights which are given to the petitioner in the premises are given by statute, passed in derogation of the common law. It is claimed by the respondent that in determining those rights the rule established in section 4 of the Code of Civil Procedure is to be applied, and the statutes are to be liberally construed, with a view to effect the object and to promote justice. That is true, so far as applies to the provisions of the code, when applied to the acts of the deceased done since the passage of the codes. But the converse of the proposition is the rule, so far as reliance is placed upon statutes passed prior to the codes and acts done under them. (*Pina* v. *Peck*, 31 Cal. 359.) And even as to the code, "liberal construction" does not mean enlargement or restriction of a plain provision of a written law. If a provision of the code is plain and unambiguous, it is the duty of the court to enforce it as it is written. If it is ambiguous or doubtful, or susceptible of different constructions or interpretations, then such liberality of construction is to be indulged in as, within the fair interpretation of its language, will effect its apparent object and promote justice.

The law in force at the time of the birth of the respondent reads as follows: "Every illegitimate child shall be considered as an heir of the person who shall, in writing, signed in the presence of a competent witness, have acknowledged himself to be the father of such child."

(Stats. 1850, p. 220, sec. 2.) This statute must be strictly construed. (*Pina* v. *Peck, supra.*) There is no pretense that any such written acknowledgment was ever made. It follows that, under this statute, neither oral admission nor proof (otherwise than by such written acknowledgment) of the fact of paternity will constitute the illegitimate child an heir.

This statute continued in force until March 31, 1870, when it was repealed, and the legislature passed "an act providing for the adoption of minors, and the legitimizing of children born out of wedlock." (Stats. 1869–70, p. 530.) The third section of this act provides, among other things, that an illegitimate child cannot be adopted without the consent of the mother, and that the consent of the minor, if over twelve years, shall always be necessary. If this section is construed to apply to the adoption provided for in section 9 of the same act, it requires things which there has been no attempt to prove in this case; but we think that it cannot be fairly construed to have any application to adoptions under said section 9. The first seven sections of the act provide for the adoption of children by strangers, and while the language of section 3 referred to seems to be general, we think it was intended to be limited to the cases provided for in that part of the act embraced in the first seven sections. Sections 8 and 9 read as follows: —

"SEC. 8. A child born before wedlock shall, to all intents and purposes, become legitimate by the subsequent marriage of its parents.

"SEC. 9. Either or both parents of an illegitimate child, or the father with the consent of his wife, or the mother with the consent of her husband, may acknowledge such child as his or their own, by a document in writing, executed by either if single, or both if married, or by treating, receiving, or acknowledging him publicly as his or their own legitimate child; and such child, and the one mentioned in the foregoing section,

shall, to all intents and purposes, be deemed legitimate from the time of its birth, and entitled to all the rights and privileges of legitimate offsprings."

This statute must also be strictly construed, for it was not until the adoption of the codes, and is only as to the codes, that the rule that statutes in derogation of the common law must be strictly construed was changed. This was the first statute which authorized legitimizing of an illegitimate child by any mode other than the written acknowledgment provided for in the statute of 1850, and at the time of the adoption of this statute the respondent in this case was a little over four years of age.

This statute remained in force until January 1, 1873, when section 230 of the Civil Code took its place. That section, so far as relates to the legitimizing of an illegitimate child, provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth." This provision, being a part of the code, is to be liberally construed, but it is not retroactive, and relates only to minor children. (*Estate of Pico*, 52 Cal. 84, and 56 Cal. 413.) Section 1387 of the same code is a part of the chapter on succession, and provides: "Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child; and in all cases is an heir of his mother, and inherits his or her estate in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock." It is contended that this provision of section 1387 is a limitation upon section 230, but we do not think that the code should be so construed. The whole chapter on adoptions relates to the adoption of minors; and by the express provision of this section

230, an illegitimate minor, acknowledged and adopted as therein provided, "is deemed to be legitimate for all purposes." One of the objects of adoption, and of legitimizing by adoption, is to give the capacity of inheritance. It has been already determined in the *Estate of Pico, supra*, that this section relates only to minors, who alone are subjects of adoption, and that section 1387 provides for giving to illegitimate adults the capacity of inheritance.

It follows from these statutes, and the rules of law applicable to the construction thereof, that prior to 1870, when this respondent was four years of age, he, the respondent, could not have been adopted by the deceased, or given the capacity of inheritance from him, except by acknowledgment in writing in the presence of a competent witness; that from March 31, 1870, to January 1, 1873, he could have been so adopted and given such capacity either by acknowledgment in writing, as before, or by the deceased having "treated, received, or acknowledged him publicly as his own legitimate child." Both these statutes must be strictly construed. (*Pina* v. *Peck*, 31 Cal. 359.) It is conceded there was no written acknowledgment, such as prescribed by either statute. The act of 1870 cannot be construed as retroactive, so as to give force or effect to acts done or performed before its passage, which they would not have had at the time they were so done or performed. Since the 1st of January, 1873, he could have been so adopted and given such capacity of inheritance by the deceased having "publicly acknowledged him as his own, receiving him as such . . . . into his family, and otherwise treating him as if he were a legitimate child"; and this provision is to be liberally construed. But liberal construction does not mean that even this provision is to construed to be retroactive. Nothing that was said or done by the deceased prior to January 1, 1873, can be construed as proving, or tending to prove, such adoption, unless it

had that effect at the time it was said or done, and under the law then in force.

Liberal construction does not require or authorize the frittering away of the written law. Nor are we authorized to consider the apparent justice or hardship of particular cases, for we are not appointed to decide cases alone, but to settle principles first, and second, to decide cases according to those settled principles as applied to the facts presented in the cases. The decision of a single case according to its apparent justice or hardship might establish a principle that would cause greater injustice or greater hardship in numerous other cases. While it is true that illegitimate children are themselves innocent of wrong, and are for that reason entitled to the sympathies of mankind, and to such reparation as the laws can give, it is equally true that courts ought not, by any extraordinary liberality in the construction of those laws, to enable wantons in silk, having children without names, to prey upon the estates of dead men, however much they may have thrived through the fears of living ones. While in this particular case no adventuress is seeking to recoup for her own wrong, it is important to see that a rule of law is not established by construction, which would place a premium upon perjury in other cases, though none may be manifest here. Of the women who are mothers of nameless children, there are few indeed who would hesitate at any fraud, or to whom perjury would seem a crime, if by means of it a dead father, who had left a goodly estate, could be secured for the nameless one, and this even while continuing in illicit intercourse with the actual father still living. And human nature is so weak, that even men are not wanting who would aid their mistresses in palming off their own children upon the estates of dead men, if thereby a competence could be secured upon which both, with their illegitimate offspring, could continue to live in luxury and in crime. On the other hand, the

court ought never, by a strained construction in the other direction, to relieve a licentious man or his estate of any of the obligations or burdens which the legislature has imposed as a restraint upon vice, as a reparation to those who actually suffer from his vices, or as a protection to the commonwealth from the burden of supporting the nameless offspring of his crimes. Between these two dangers, the duty of the court is fairly to interpret the laws as the legislature has framed them, without regard to how its action may affect individual cases. If thus interpreted they are found to be too stringent or too liberal, the remedy is through the legislature, and not the courts.

Acting upon these rules of interpretation and construction, the inquiry is, whether the acts and declarations of the deceased amounted to a public acknowledgment by him of this child as his own, receiving it as such into his family, and otherwise treating it as if it were a legitimate child.

As he had no home and no family, in the strict sense of "a collective body of persons who live in one house and under one head or manager, a household including parents, children, and servants," it would not be a fair or liberal construction to say that the child had not been adopted or acknowledged because he had not been received in such a home or made a member of such a family. On the other hand, since it is a fact that the deceased did have a family, in the sense of having "brothers and sisters, kindred, descendants of one common progenitor," with some of whom he was brought into frequent contact, and also business associates and friends with whom he was in daily intercourse, from all of whom he not only studiously concealed, and to his brother in express terms denied, the relationship, it would require a liberality of construction destructive of the language of the statute itself to hold that there had been an adoption within the meaning of the code, or of

the statute of 1870. And it is conceeded that there was none under the statute of 1850.

An analogous question was recently considered by this court at great length, in the case of *Sharon* v. *Sharon*, 79 Cal. 633, and the sum of the conclusion there reached was, that the parties must have held themselves out to their relatives, friends, acquaintances, and the world as occupying toward each other the relations claimed for them in the action. Speaking generally, the laws applicable to this case seem to require something like the same kind of public acknowledgment and recognition as was required in that case. Was there such acknowledgment and recognition?

Let us consider briefly what is and what is not shown by the evidence. We assume for the purposes of this opinion that the paternity was sufficiently established. That alone, unless established by written acknowledgment in the presence of a competent witness, which was not done in this case, does not establish adoption or give a right of inheritance.

It is also in evidence that when the mother of this child was about to be confined, the deceased brought her to this city and procured for her care and maintenance at the house of a reputable negro nurse during the period of her confinement and illness. One witness, a dentist, with whom the deceased had some acquaintance, and to whom he applied for some professional service for the mother before her confinement, says that at that time the deceased acknowledged to him that the child about to be born of that woman was his; that he said he would not marry the girl, but would be just with her, and pay all the expenses of her care; and would care for the child. Another, a colored woman who had the care of the boy after the first few years of his existence, and daughter of the nurse where the child was born, testifies that, at about the time the mother was brought to the house of her mother, she overheard a

conversation between the deceased and her mother, in which deceased acknowledged that he was the father of the child about to be born, and intended to provide for it. She also says that deceased then also promised that he would marry the girl. This is the only direct testimony tending to show a promise on the part of the deceased to marry the child's mother. It is given by one who was herself a child at the time when she says the promise was made. This is in direct conflict with the statement made about the same time to the dentist. The conflict, however, is of little moment, except as it shows a conflict between the two witnesses, without whose testimony the respondent has no case whatever, and tends to show that the recollection of the colored woman, as to events happening and declarations made during the period of her own childhood, may not, in all cases, be reliable.

It is sufficiently shown that the mother of the child remained at the house of the nurse about seven weeks, during which the deceased called there frequently, the witness says, and Jessup paid all the expenses. After the mother left, the child was kept and cared for by the nurse, at the expense of Jessup, who called frequently to see it, and as it got old enough to observe things, would play with it, calling it his boy, and calling himself daddy, and at a still later period would take the child and the witness, who appears at that time to have acted the part of nurse-girl to the child, to North Beach and let it see the animals there, and buy nuts and cakes for it to feed to them. The girl says that he was very fond of the child, and that it was called Richard at his request. Her testimony is very full as tending to show his interest in and apparent affection for the child while it remained at the house of the original nurse and in the city of San Francisco; she saying, among other things, that he said "he wanted to make a man of him"; and "if Richard behaves himself and does

what. I want him, he will not be sorry for it," and many other expressions of this kind. All this might have gone far toward proof of acknowledgment and adoption if it had been public and at a time when the law authorized adoption by such kind of acknowledgment. But it was never public. It was made and done only to and in the presence and hearing of the negro family, in whose care he placed and continued to keep it. When he took it out it was with the negro girl, and then not to a place where he would be likely to meet members of his own family and friends. And it all occurred during the period of the child's residence in San Francisco. During all that time the law of 1850 was in force, and no kind of acknowledgment or recognition would amount to adoption unless it was in writing and duly witnessed.

According to the testimony of this witness, she was herself about thirteen years of age when the respondent was born. In May, 1868, she married and removed to Petaluma, and two months afterward, when the respondent was less than two years old, he was removed to her residence in Petaluma, and that continued to be his residence until 1876, when he was sent away to school. It will be observed that this removal to Petaluma occurred prior to the passage of the act of 1870, and it is a significant fact that it is not shown that the deceased ever visited the boy after such removal, either in sickness or in health, and is affirmatively proved that he never did visit him while living at Petaluma. Nor is it shown that the two ever lodged, even for a single night, in the same house, or ever but once sat down at the same table, or even in the same dining-room, in their lives. It is shown, however, that deceased continued to provide for the boy's maintenance while at Petaluma, and subsequently had the colored woman take him to Washington College, where he had arranged for his board and schooling, and where he was entered and known, as he had been known at Petaluma, by the name of Richard Miller, the latter

being the family name of the colored people with whom
he had been living.   The witness testifies that when she
had her own children christened by a colored clergyman
at Petaluma, she, at the request of Jessup, had Richard
christened by the name of Richard Page Jessup; and the
deposition of the clergyman shows that he had some recol-
lection of such an occurrence, but no public or church
record was made of the fact, and the private record kept
by the clergyman had been lost.   It is not shown that
Jessup had any knowledge of this fact, except that the
witness says she had it done at his request, and that
afterward she informed him of the fact, and he gave her
five dollars to give to the preacher.   The boy was never
known anywhere by the name of Jessup, but always and
everywhere by the name of Miller.   He was placed at
school as a ward of Jessup, and the accounts were kept
against Jessup as guardian of Richard Miller.   Two or
three witnesses testify that while at school, when he was
sixteen or seventeen years of age, the young man himself
declared that he did not know who his father was; and
it is fairly deducible from the whole evidence that he
never did know Jessup as his father, or call him such,
although he knew that, sometimes directly and sometimes
indirectly, Jessup was contributing to his support.   Jes-
sup's diary, and all the accounts and memoranda kept
by him relating to the boy, that could be found among
his effects, were brought into court, and nowhere among
them is there an entry of any kind indicating an acknowl-
edgment of the boy as being his son, — every reference
that is made to him is as Richard or "Dick" Miller.

It is patent, however, from the evidence that for four-
teen or fifteen years he secretly provided for the mainte-
nance of that boy, — that is to say, as secretly as such a
thing could reasonably be done without sending the boy
entirely out of the country, — and the evidence discloses
abundant reason why he was not sent away.   This could
not have been done without causing a *denouement,*

which he was constantly seeking to avoid. Necessarily, the maintenance was not entirely secret. He was compelled to act through and to deal with others in providing for the care and education of the boy. But he always acted through channels that were not within the circles of his ordinary dealing, or his ordinary association, and as far as possible without the knowledge of his family. The fact of the boy's existence, and that Jessup was supporting him, was communicated to his brother while yet the child remained in San Francisco, by the nurse in whose charge he was. A few days afterward the brother asked Jessup about it, and asked him if it was his boy, to which Jessup replied: "No, it ain't my boy." Neither of the brothers was at that time occupying such social positions that either would have been likely to deny paternity through either fear or shame. During the last year or two of his life, Jessup was in feeble health, and it is apparent that both he and his brother felt that his end was approaching. During that period the brother again asked him about the boy, and asked him: "Gus, whatever became of that boy you were taking care of?" To which Jessup replied: "The boy,—I tried to make something of him. I have taken care of him, and have tried to make something out of him, but he didn't amount to anything, and I let him go." And the brother swears that Jessup never did acknowledge to him that the boy was his.

Some six or seven witnesses are called beside the dentist and colored woman above referred to, who testify to conversations with the deceased at different times, in which he spoke of the boy as "his boy," and among them we notice that four, beside the dentist and colored woman, sometimes used the words "my son," instead of " my boy," as having been spoken by the deceased; but with all the witnesses who are examined on the subject, " my son," is the exception to the rule, the more common form being " my boy," and the still more common

form being "the boy." These witnesses may all be per-
fectly honest, and still by mistake may have used the
words "my son," in the isolated cases where they have
used it, when in fact they should have used the form of
expression most commonly adopted by them, "my boy,"
or "the boy." But it makes no difference whether they
were mistaken or not. None of these witnesses were
members of Jessup's family, and with a single exception
they were not persons likely to come in contact with his
family. None of them were his business associates, and
such of them as could in any sense be called his com-
panions were only so during such portions of his time
as he was in hiding from society. They were not per-
sons likely to make public what he had said to them on
such a subject, but rather to accept it as a matter of con-
fidence, to be kept secret. Most of them were persons
with whom he was brought in contact in the business of
providing for the wants of the boy, and to only a few of
those persons did he ever make any such revelations;
and in no case were they so made as to amount to public
acknowledgment. To the clothier from whom he al-
ways purchased the boy's clothing, he always spoke of
him as "the boy," never using any expression to indi-
cate that it was his son for whom he was providing. To
an artist, to whom he paid one hundred dollars for paint-
ing a portrait of the child when an infant, he never used
any form of expression to indicate a relationship to him,
or why he had the portrait painted. But the fact that
he procured this portrait is urged as strong evidence
tending to show his affection for and his intentions tow-
ard the boy. It does not so strike us. It was procured
prior to 1870, and consequently proves nothing in the
way of adoption. It was retained by him for some ten
or twelve years, and during a portion of the time was
seen by some few persons in his room. He then had it
revarnished, and this fact is dwelt upon as another evi-
dence in support of the theory of adoption, and one

occurring after the adoption of the code. But the evidence discloses other facts which, to our minds, militate directly against this theory. It shows that although the mother, for the protection of her own good name, had left the boy to be provided for entirely by Jessup, her heart was constantly crying out for her baby boy, and she was seeking some memento of him. Just about the time this picture was finished she was married. When afterward it was retouched and freshened up she had become a widow, and had removed from the neighborhood in which her kindred resided. It is not shown that she ever received the picture, but on the other hand it is not shown that it was retained in Jessup's possession after it had been retouched, and it is not found among his effects. It does not appear that any effort was made to find it among the effects of the mother, who had died some time before Jessup did.

S. O. Putnam is one of Jessup's executors. He was the executor of a brother of Jessup, who died about 1865, and through whom Jessup received most of his fortune. Putnam and Jessup were always on very intimate relations, ever since the distribution of the former estate; and much of the time Putnam had funds of Jessup's in his hands. He knew that Jessup was providing for a boy, and during a portion of the time such provision was sometimes made through Putnam, but Jessup never told Putnam that the boy was his. In 1881 Jessup sent the boy to San Diego, to go upon a ranch. That was the only time Putnam ever saw the boy. In 1882 the boy returned of his own accord, but instead of going to Jessup, he went direct to Mrs. Hatton (formerly Mrs. Miller), the colored woman, then residing at Napa, and from there communicated with Mr. Putnam, writing to him several times for money. These letters were shown to Jessup, and once Jessup authorized some money to be sent to him, but after that, for the balance of his life, Jessup refused to have anything to do with the boy.

Without dwelling further upon the details of the evidence, it may be summed up as follows:—

It is shown that before and at the time of the birth of this respondent, Jessup had promised the mother that he would protect her good name by providing for the care and maintenance of this child. So long as the mother lived, he was in fear of personal difficulty from her kindred if he failed to keep this promise. This is shown by the evidence of Mrs. Hatton as to the earlier years, and of Mr. Jackson, and perhaps some others, as to the later years. While the mother lived, and until the boy had reached an age when Jessup seemed to think that he ought to be self-sustaining, he kept that promise. But in keeping it, he kept the boy out of the circle of his own association. To a very limited number of persons with whom he was brought in contact in providing for the boy he spoke of him as "my boy," and possibly to a less number he may have used the words "my son"; but he never used these expressions either to or where they were likely to come to the knowledge of his own family or kindred, or to his most intimate and confidential business acquaintances and friends. He never visited the boy after he was two years old, or after the passage of any law under which adoption could result from any line of conduct other than written acknowledgment duly witnessed; and when the boy was brought or in later years came to him, as he sometimes was and did, he did not entertain him, or keep him with him, for any length of time, but made his interviews brief, provided for his wants, and sent him away. And it does not appear that he ever but once made the boy a present, and then only of a five-dollar watch. Instead of providing for him among people of his own race, he reared him and had him brought up in a colored family, respectable, it is true, but still a family of another race, commonly considered inferior, and to be brought up among whom is regarded by many people of the race of the puta-

tive father as degrading; sent to the public school with the colored children, forbidden to bear his name, and allowed him all his life to be known by the name of the colored family in which he was reared; when sent to college, taken there by his colored nurse, and entered there by her name; at last placed upon a farm in San Diego, and when he returns from there going to the only home he ever knew,—the home of his colored friends,—and there becoming a boot-black and waiter in a colored barber-shop, and finally left to start from such surroundings and associations to make his own way in life.

And as further evidence in negation of the idea of adoption, it appears that within a year after the boy was born, and at the time when Jessup was, according to the testimony of the colored nurse, showing more evidences of affection for the boy, and of desire to provide for his future, than he ever afterwards did, he (Jessup) makes a will, in which he wholly omits all mention of the child, or any provision for him, and never afterward changed it. It is true, the colored woman says he frequently told her he was going to provide for the boy, and another woman, whose relations with Jessup were, to say the least, not above suspicion, testifies that toward the close of his life Jessup told her that he had made a will in which he had provided for both herself and the boy, —but no such will has ever been found, and it is not only fair to presume, but for the purpose of this case as it stands must be presumed, that none such was ever made. In his intercourse with his own family, he denied his relationship to the boy, and with those most intimately connected with him in his business relations, and who, by reason of such connection, acquired some knowledge of what he was doing, he never admitted or communicated that he was doing anything more than "putting up" for the boy.

It is said that as Jessup was never married, he was

LXXXI. CAL.—28

not bound to receive this child into his family, for he had none in which to receive it. But we do not so read the law. The language is: "Publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child." If he has a wife, he can only receive it into the family with her consent; but if he has no wife, he must still receive it into his family,—that is to say, in such family as he has, the child must be acknowledged and treated as his,— at least, he must not deny to the members of such family that it is his.

Under this evidence, we are forced to conclude that Gershom P. Jessup never did "publicly acknowledge this child [the respondent] as his own," or "receive it into his family," or "otherwise treat it as if it were a legitimate child." It follows that the judgment or order appealed from must be reversed, on the ground that the evidence is insufficient to justify the decision.

So ordered.

Sharpstein, J., Thornton, J., and McFarland, J., concurred.

Paterson, J., dissented.

Works, J., dissenting.—I dissent, for the reasons stated in the opinion filed on the former hearing of this case, written by me and concurred in by a majority of the court. No new point was made on the second hearing, and nothing additional, either of law or fact, was developed. The second hearing strengthened my views as expressed in the former opinion, and the manner in which the evidence is treated in the prevailing opinion of Mr. Justice Fox has served to confirm my first convictions.

Beatty, C. J., dissenting.—I dissent. Reargument and re-examination of this case have convinced me that

our former decision was correct, and have not materially changed my views as to the validity of the particular grounds upon which it was based. It is conceded—it would have been impossible to deny—that the proof of respondent's paternity is complete. The only argument that can be made against his claim to inherit his father's estate rests upon a strict construction of the statutes, remedial in their nature, designed to secure to innocent unfortunates in his situation a just share of the rights to which they are by nature as fully entitled as are legitimate offspring. No doubt a strong argument can be built on this basis of strict construction against the decision of the superior court. But I adhere to the view so strongly put and so satisfactorily maintained by Justice Works in his opinion, that in cases of this kind the only strictness required is in proof of paternity. That being satisfactorily established by plenary proof, I think courts should lean strongly in favor of a finding that the father of an illegitimate child has done what every honest and humane man should be not only willing but eager to do, and what a just law would compel the unwilling to do.

I also think it a wholly unauthorized construction of the statute to hold that the acts of recognition, acknowledgment, etc., necessary to legitimize a natural child, should be performed with the *express intention* on the part of the father of accomplishing that object. If the acts are in themselves such as the statute prescribes, I think they confer legitimacy without any reference to the intent with which they are performed. There is no danger to morality in recognizing the natural rights of illegitimate children as against their fathers, or other claimants of their estates. And there is no danger of encouraging the fabrication of spurious claims so long as strict proof of paternity is insisted upon.

From this point of view, the evidence here is amply sufficient to sustain the decision of the superior court.

Between the passage of the act of March, 1870, and the adoption of the code, Gershom P. Jessup, if the witnesses told the truth, did enough to legitimize the respondent, and no subsequent neglect could deprive him of the *status* so acquired.

The following is the opinion above referred to, rendered in Bank on the original hearing on the 1st of July, 1889:—

WORKS, J.— Gershom P. Jessup, an unmarried man, died testate, leaving an estate valued at about one hundred thousand dollars. By his will he devised and bequeathed his estate to his brother and sisters. The will was admitted to probate, and letters issued to the executors named therein. The respondent, Richard Page Jessup, filed his petition in the court below, alleging that he was the illegitimate son of the deceased, and had been adopted by him, whereby he became his legitimate son and heir, and praying for a partial distribution of the estate to him. Upon a full hearing the petition was granted, and an order made distributing the whole of the estate to the petitioner, upon his giving bond to secure the payment of the debts of the estate and costs and expenses of administration.

From this order the executors of the estate and the legatees under the will have appealed.

The really controverted question in the court below was, whether or not the deceased had adopted the respondent as his son in such manner as to constitute him his heir.

Some objections are urged in the brief for appellants to certain rulings upon the admission and exclusion of evidence. Most of the rulings complained of relate to evidence tending to show that the respondent was the son of the deceased. Counsel for respondent contend that these rulings, if erroneous, were harmless, for the reason that the paternity was expressly admitted by

counsel in the court below. No such admission appears in the record, but the fact of such paternity is not disputed in this court, and the evidence of the fact, independent of any testimony claimed to have been erroneously admitted or excluded, is so clear and conclusive that the appellants could not have been injured by any of the rulings complained of.

So far as the rulings apply to other material matters, we find no error for which the cause should be reversed.

It is contended that the court below had no jurisdiction to make the order appealed from, for the reason that the non-resident legatees were not notified of the pendency of the proceeding. The court below proceeded under sections 1658 and 1659 of the Code of Civil Procedure. Section 1659 provides that notice of the application must be given to the executor or administrator personally, and to all persons interested in the estate, in the same manner that notice is required to be given of the settlement of the account of an executor or administrator.

Notice of the settlement of an account of an executor or administrator is provided for as follows: "The clerk must thereupon give notice thereof by causing notices to be posted in at least three public places in the county, setting forth the name of the estate, the executor or administrator, and the day appointed for the settlement of the account. The court or a judge *may* order such further notice to be given as may be proper." (Code Civ. Proc., sec. 1633.)

It is not claimed that the notice expressly required by the statute was not given, but it is contended that this was a case in which the court should have ordered further notice to be given. Whether such additional notice shall be given or not, is a matter within the discretion of the court below, and in the absence of anything to show that such discretion has been abused, this court will not interfere. There was no such abuse of discretion

here. One of the executors, who was a resident of this state, was a brother of the deceased and of the other legatees under the will, and his interest in the proceeding was identical with those of the other legatees. As to the non-resident parties in interest, an attorney was appointed to look after their interests, and did so throughout the proceeding. Their rights, if they had any, were thoroughly represented and carefully guarded by competent and able attorneys, who acted for them as well as the executors.

Again, it is contended that the court had no jurisdiction to determine the question of the heirship of the petitioner in this proceeding; that the right to ask for partial distribution by an heir, where there is a will in which he is not named, must be confined to children born in lawful wedlock; and that he must assert his right to the estate, or any part of it, by a contest of the will, or must first establish the fact that he is an heir by proceeding under section 1664 of the Code of Civil Procedure. A distinction is thus attempted to be made between an heir born in lawful wedlock and one that has become such by adoption. Counsel contend that section 1386 of the Civil Code, which provides for the succession to and distribution of estates, does not apply to illegitimates, and in support of the position cite *Estate of Magee*, 63 Cal. 414; *McCord* v. *Smith*, 1 Black, 459; *Hughes* v. *Decker*, 38 Me. 153.

These cases relate generally to the right of an illegitimate child to inherit, and have no application to a case of adoption by the father.

Whether the petitioner was an heir, and entitled to distribution as such, was a question of fact to be determined by the probate court before an order for such distribution could be made. We see no reason for holding that the court could not consider and decide this question of fact, because his right of inheritance must be established by proof that he was an "illegitimate

child of the deceased, and adopted by him, instead of proof that he was a child born in lawful wedlock." It is no more a contest of the will in one case than in the other. The fact of heirship, when established, must have the same effect upon the will, and the rights of the legatees thereunder, in both cases. The fact of heirship is one that must be found by the court in either case, and the jurisdiction cannot be denied, because the fact to be adjudicated must be established by evidence of a different kind where the claim rests upon adoption. It cannot be treated as a contest or revocation of the will of the deceased, because the property distributed goes to one not named therein.

The position that this was a taking of property without due process of law cannot be maintained, for the plain reason that notice was given as required by law in such cases.

The position that the heirship of the petitioner must be established in the manner provided in section 1664 of the Code of Civil Procedure before he can maintain a proceeding for partial distribution is not well taken. The proceeding provided for in the section referred to is not exclusive of the right to have the question determined at the hearing of the application for distribution. (*Estate of Oxarart*, 78 Cal. 109.)

We come now to a consideration of the main issue in the case, viz., whether or not the finding by the court below that the petitioner was adopted by the deceased as his son and heir, is sustained by the evidence. At the outset, counsel for the appellant insist that the question is not one of conflict of evidence, but purely a question whether or not the facts proved constitute such acts and conduct on the part of the deceased, toward the respondent, as amounted to an adoption of him as his heir, and that the claim of heirship must be sustained by evidence clear, indisputable, and conclusive. The question whether the acts and conduct of the deceased,

as testified to, admitting them to have been proved, amount to an adoption or not, is a matter of law to be determined by the court, but whether such facts are established by sufficient evidence, there being testimony directly on the point, is a question of the weight of the evidence, and the credibility of the witnesses, to which the well-established rule as to conflicting evidence must apply.

The cases cited by the appellant, to the effect that where clear and conclusive evidence of a fact is required, the appellate court may inquire whether the evidence proves such fact to such a degree of certainty, no doubt state the law correctly; but in order to make them applicable here, it must be assumed that such a degree of certainty is required in this class of cases, which we think is a mere assumption without authority to support it. So far as the mere question of adoption is concerned, no greater degree of certainty in the evidence should be required in this than in other ordinary cases.

The cases cited by counsel are such as call for exceptionally clear proof, for the reason that they seek to defeat a written instrument or the like. (*Ford* v. *Osborne*, 45 Ohio St. 1; *Cummings* v. *Baars*, 36 Minn. 350; *Anthony* v. *Chapman*, 65 Cal. 73.)

In order that we may intelligently consider the evidence and the effect to be given it, we must first call attention to certain dates, and construe the several statutes bearing upon the question in dispute.

The respondent was born March 20, 1866. The will of the deceased was executed August 28, 1867. The deceased died November 2, 1886. His will was probated November 22, 1886, and the respondent's petition for distribution was filed April 11, 1887. The law in force at the time of the birth of the respondent was the statute of April 11, 1850, which provided: "Every illegitimate child shall be considered as an heir of the person who shall, *in writing signed in the presence of a*

*competent witness, have acknowledged himself to be the father of such child."* (Stats. 1850, p. 220, sec. 2.)

By an act approved March 31, 1870, general provision was made for the adoption of minors, and the statute of 1850 was expressly repealed. (Stats. 1869–70, p. 530.)

Section 9 of this statute related to the adoption of illegitimate children by either or both of the parents, and provided as follows:—

"SEC. 9. Either or both parents of an illegitimate child, or the father with the consent of his wife, or the mother with the consent of her husband, may acknowledge such child as his or their own by a document in writing, executed by either if single, or both if married, or by treating, receiving, or acknowledging him publicly as his or their own legitimate child; and such child, and the one mentioned in the foregoing section, shall, to all intents and purposes, be deemed legitimate from the time of its birth, and entitled to all the rights and privileges of legitimate offsprings."

Section 3 of this act provided that an illegitimate child could not be adopted without the consent of its mother, and that the consent of a minor, if over twelve years of age, should always be necessary.

This statute continued in force until January 1, 1873, when the Civil Code took effect. Chapter 2 of the Civil Code provides generally for the adoption of minor children in much the same terms as in the statute of 1869–70. (Civ. Code, secs. 221–230.)

The Civil Code, section 230, provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

Section 1387 of Civil Code, which is a part of the chapter on succession, provides: "Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child; *and in all cases is an heir of his mother;* and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock."

The appellants contend:—

1. That the statutes authorizing the adoption of an illegitimate child by the father should be strictly construed.

2. That there could have been no adoption of the respondent under the statute of 1850 by any acts or conduct of the deceased toward him, for the reason that, under that statute, the only way in which such adoption could have taken place was by a writing to that effect, signed in the presence of a competent witness.

3. That such acts as are shown to have been done prior to the enactment of subsequent statutes, enabling the father to adopt his illegitimate child without any written acknowledgment, cannot be considered in determining whether there was an adoption or not, because the statute cannot be construed to be retroactive, and the question of adoption is one of intent on the part of the father, and his acts and conduct, tending to indicate what his intention was, must be construed in the light of the statute in force at the time.

4. That there could be no adoption under either of the statutes, or the code, without the consent of the mother, and that no such consent has been shown.

5. That section 1387 of the Civil Code is a limitation upon section 230 as to the right of inheritance, and that under section 1387 there can be no inheritance except where there has been a written acknowledgment of the child.

6. That the evidence is insufficient to prove an adoption of the respondent by the deceased.

The points stated are given in our own language, as the substance of the very elaborate briefs of counsel. We shall endeavor to dispose of each of them in its order.

1. As to the strictness with which the statutory provisions referred to should be construed, we are not without authority. (*Estate of Sanford*, 4 Cal. 12; *Pina* v. *Peck*, 31 Cal. 361.) The cases cited are clearly to the effect that the statute, being in derogation of the common law, must be strictly construed. So far as the cases relate to the degree of proof required to prove the *parentage* of the alleged father, or that the claimant is *his* illegitimate child, we fully concur in the views expressed, but no further. If the proof of parentage is clear, then the rule to be applied should be the reverse of that contended for by the appellants. It should be the policy of the law to require the father of a child, whether legitimate or illegitimate, to assume toward it the duties and responsibilities of a father. (*Hargrove* v. *Freeman*, 12 Ga. 342.) This state has made no provision by which the paternity of an illegitimate child may be judicially determined, and the father compelled to contribute to its support. These unfortunates are left to be supported by the mothers, who are usually unable to maintain or educate them properly, or by public charity, and as a result many of them, whose fathers are amply able to support and educate them, become paupers and criminals. The legislature has, in a very slight measure, made amends for this anomalous state of affairs by providing that the illegitimate child may, so far as its legal rights are concerned, by acts of the father be made legitimate. The object is laudable, and should receive the aid and encouragement of the courts, and to that end the statute, so far as it provides how this being born again may be brought about, should be liberally construed. If the paternity of the child be the matter in dispute, strict proof of the fact should be required, but once the pater-

nity is established, the statute should be liberally construed, so far as it affects the question of legitimizing the child. We may fairly assume that such was the legislative intent. The earlier statutes requiring a written acknowledgment were, as we have seen, strictly construed. This was followed by more liberal statutes, authorizing the legitimizing of this class of children, which clearly indicates · that such construction was not consistent with the object and purposes of such legislation.

In this case, as we have said, the fact of paternity was so clearly established by the proof that it is not controverted here. The only question, therefore, that this court is called upon to consider is whether or not, being an illegitimate child of the deceased, the respondent was by the acts and conduct of his father adopted as legitimate. As to this branch of the inquiry we hold that the statutes relating to the subject should be liberally construed. (*Dickenson's Appeal*, 42 Conn. 491; 19 Am. Rep. 553; see Commissioners' comments in note to section 230, Deering's Civil Code.)

2. The point made that there could have been no adoption under the statute of 1850 is well taken, for the reason that under that statute a written acknowledgment was necessary, and none such was shown by the evidence. But it does not follow that the conduct and acts of the deceased, prior to the enactment of subsequent statutes, cannot be taken into account in determining whether or not there was an adoption, where, as in this case, as we shall show presently, such acts, conduct, and treatment were continuous from the birth of the respondent until the death of the deceased. If the acts relied upon had all taken place before the statute authorizing an adoption in that manner took effect, the position of counsel for appellant that the subsequent statute could not be construed to be retroactive, so far as to render proof of such acts sufficient to establish the fact of adoption, would be

correct.   (*Estate of Pico*, 52 Cal. 84; *Brown* v. *Belmarde*, 3 Kan. 41.)

3. It follows that, conceding that the question of adoption is one of intention on the part of the alleged father, it was not only competent to prove such prior conduct on his part as tending to show the purpose and object of his subsequent treatment of the respondent, but the whole of his treatment of him, being continuous in its nature, must be taken into account in determining whether or not there was an adoption under the later statutes.  If, taking his whole conduct toward and treatment of the child, it appears that it is sufficient to show an adoption, we think the case is made out, notwithstanding some of the acts proved appear to have taken place before the later statutes took effect.

In support of the opposite view, counsel cite *Morgan* v. *Perry*, 51 N. H. 559; *Brown* v. *Belmarde*, 3 Kan. 41; *Estate of Pico*, 52 Cal. 84: *Hartinger* v. *Ferring*, 24 Fed. Rep. 15.

These cases do not meet the question presented.  In the *Estate of Pico* it was held that section 230 of the Civil Code could not be construed to be retroactive; that all of the acts shown, since the enactment of that section, were after the claimant had arrived at full age, and that as the statute only authorized the adoption of *minors*, the claimant was not within its terms, and no adoption was shown.  This was precisely the same, in legal effect, as if no acts tending to show an adoption, after the statute took effect, were shown, which presents an entirely different question.  In the case of *Brown* v. *Belmarde* the statute under which the adoption was claimed to have taken place was enacted after the death of the alleged father, and it was claimed that the statute related back. It seems unnecessary to say that this case is not in point. In the case of *Morgan* v. *Perry* the statute required marriage of, and recognition by, the parents.  The parents of the claimant had married and taken him into the

family forty years before the statute was enacted, and it was held that the statute did not apply. *Hartinger* v. *Ferring*, is to the same effect.

We do not regard any of these cases as of any weight, except upon the simple question whether the statute can be treated as retroactive, in the sense in which we have held it to be so, as above stated.

4. As to the point raised that there could be no adoption without the consent of the mother, we cannot agree to the proposition that such consent is necessary where the adoption is by the father, and especially where such adoption is the result of his conduct toward the child, and does not depend upon any formal proceeding. The provision of the statute must be held to apply to adoptions by persons other than the father. This is apparent from a reading of the statute of 1870, and of the provisions of the Civil Code. (Stats. 1869–70, p. 530; Civ. Code, secs. 221–230.)

Sections 1 to 8 of the statute of 1870 relate exclusively to adoptions by other persons than the father, and include the provision requiring the mother's consent. Sections 8 and 9, although parts of the same act, are, as to the procedure, essentially an act to themselves, providing for an adoption in an entirely different manner, not including such consent. This is made manifest by section 230 of the Civil Code, which provides in express terms that "the foregoing provisions of this chapter do not apply to such an adoption." One of the foregoing provisions is the one requiring the consent of the mother of the illegitimate child.

In *Estate of Pico*, 52 Cal. 84, relied upon by the appellants, the sole question was whether a person not a minor could be adopted under section 230. This court said in that case: "Except for the concluding words of the section, 'the foregoing provisions of this chapter do not apply to such an adoption,' it would be clear, beyond controversy, that this section, like all those which pre-

cede it in that chapter, had reference to *minor* children. But taking the whole chapter together, we are satisfied that when section 230 declares that 'the foregoing *provisions* of this chapter do not apply to such an adoption,' it refers only to the *procedure* by which the adoption may be effected."

This is in entire accord with the view we have taken. The provision for procuring the consent of the mother relates to the procedure necessary to effect the adoption, and is clearly within the language of the case cited.

5. We cannot agree to the proposition that the provision contained in section 1387 of the Civil Code, that "every illegitimate child is an heir of the person who, *in writing, signed in the presence of a competent witness,* acknowledges himself to be the father of such child," is a limitation upon section 230, and excludes an illegitimate child, adopted as provided in the latter section, from the inheritance. If so, section 230 would be deprived of much of its force. One of the legal consequences of an adoption is the right to inherit from the adopted father. Section 1387, of the code is, no doubt, based upon the former provision of the statute requiring the adoption to be in the manner therein indicated, and has never been made to conform to the later and more liberal provision. But however this may be, the provision in section 1387, that certain illegitimates may inherit, cannot be held to exclude others, who have been adopted as provided by law, from the right of inheritance. Section 230 expressly provides that upon the adoption of a child as therein provided, it shall "be deemed to be legitimate for all purposes." (See *Estate of Wendell,* 57 Cal. 484.)

6. In order to a proper understanding of the comments we make upon the evidence, it is necessary to state its substance. The testimony on the part of the respondent tended to show that the mother of the respondent resided in Marysville, in this state, and was, while residing there, on terms of intimacy with the de-

ceased; that she came to San Francisco, and was by him placed in charge of a nurse, an old colored lady, who, it appears, was a respectable, Christian woman. Soon after being placed with the nurse she was confined, and gave birth to the respondent. The deceased visited her frequently during her stay at the house, paid all of the expenses consequent upon her sickness, and after the birth of the child the mother left the city, and the deceased took the entire charge of the child from that time on, leaving it with the nurse. He provided for its maintenance, appeared to be very fond of it, took it out with him frequently when it was young, to places of amusement, took great pride in seeing that it was well dressed, paid the nurse, and an extra nurse employed by her, liberally, for taking care of the child, and paid all of the doctor's bills and other necessary expenses. After the child became old enough, he sent it to a private school, paying considerable sums of money for that purpose, and paid all of its necessary expenses. He caused a picture of it to be painted at an expense of one hundred dollars, and kept the same in his room. As to his declarations with reference to the child, we set out the evidence of various witnesses as to the same without giving names, lettering the testimony of each witness separately.

(a) "He said: 'This is my son, doctor, that I had by Miss ——. Isn't he a nice-looking boy? I think a great deal of that boy, and I am going to raise him as my boy, and look after him, and educate him, and make a man of him, and he shall be my heir.' After that we had some talk, and I asked him on one occasion whether the boy was his son. He said he had him educating him, and also told me that Miss —— had married and done well, and he was very glad of that, as it got her out of the scrape, and him too. Jessup said also that he did not want the mother to see the boy, because her parents would find it out, and he did not want

them to find it out; but he wanted to keep the boy as secret as he could from the parents, and it would save the reputation of the young lady. He told me that the boy had grown up and was most a young man, and he was going to make him his son and heir. He so told me more than once, and within the last five years, but I am unable to state when or where."

(b) "We had some further conversation after that; some conversation about the boy. He had grown to be four or five years old. Jessup knew that I knew all about the affair. We used to talk about it frequently. I recollect he brought the boy up to my place to have his teeth taken out, which I did."

(c) "My mother spoke to him about Miss ——, and wanted him to marry her; told him that Miss —— was feeling very bad, and that he had confessed to my mother that he was the father of the child. He said: 'Yes; I know I am. She was a good girl when I met her, and I caused her fall. I am the father of the child, and I intend to marry her.' Mr. Jessup called quite often; I cannot tell the number of times; two or three times a week, I should think; oftener after the child was born. He was not there more than twice before. He paid forty dollars a month for the care of Richard; that was for the board exclusively. As for his clothing, he wanted him dressed in the best. He said that he was able to pay for it, and he wanted him dressed nicely, and always to look nicely. He did not want him to wear calico dresses. He wanted him dressed in white always. He wanted him kept in white, and whatever the expense was he would pay it. He had plenty to take care of Richard with, and he intended to take care of him, and wanted him always to look nice. He visited the child, after the mother went away, quite often. I cannot tell just how often, but very often. He visited him quite often at my mother's house, before the child went to Petaluma. I cannot tell how often. If the

child was awake when he came, he would take him up and play and talk with him; if he was not awake, he would wait until he awoke. He would call him his boy and many other affectionate names. He would take him up in his arms and say, 'Come to your papa; come to your daddy'; and hold him up and ask if he was not a fine boy. He always seemed very pleased if mother said that he looked like his father. He was very fond of him. He used to take him out; would come very often, and used to take us down to North Beach; for Richard, as a baby, was very fond of the birds and monkeys and wild animals that were kept down at North Beach at the time, and his father, learning of his fondness for them, would take us down there to visit those animals, and he would buy nuts and candy for Richard to give them. The baby was rather sickly from the time it was born, and needed a good deal of care, and Mr. Jessup told my mother whenever she thought it was necessary to get a physician, and take good care of him. He was called Richard by his father's request. He said he wanted him called Richard after a uncle of his, a brother of Mr. Jessup's, who, Mr. Jessup said, was very wealthy. He said he was dead, and he would receive his estate, and that whatever he got would belong to Richard. He was leaving it to Richard, and he intended to leave him all that he had, and he would like to have him named after his uncle. He said: 'If Richard behaves himself, and does what I want him, he will not be sorry for it'; said he wanted to make a man of him; he wanted him well educated; fretted, I think, that Richard did not want to remain at school. He said that Richard was all that he had, and there were only the two of them, and that he ought to try and make him happy, and do just as he wanted him to do. He thought he ought to try and make him happy, and he would do anything for him, and make a man of him, and after his death he would have 'all that I have.' He further said he wanted

Richard to work and be self-sustaining. He wanted him to be independent, but at the same time he did not want him to want for anything. He told me his object in having Richard work was that he wanted him to learn the value of a dollar, because he wanted him to know how to take care of it; for, he said, 'when I die what belongs to me will fall into Richard's hands, and I want him to know how to take care of it.'"

(d) "I knew Gershom P. Jessup in his lifetime, about ten or twelve years, probably. We were friends. Never had any conversation with him directly about his family. With regard to the boy I had a conversation once. One of my sons was with me, and I introduced him to Mr. Jessup, and he said to me, 'I have a son that I am educating and bringing up.'"

(e) "I painted the portrait for Mr. Jessup. During the process of painting the picture Mr. Jessup called at my studio, and seemed quite interested in the portrait; I cannot exactly state how, except that he came up in the room and expressed himself pleased with it."

(f) "I said, 'You have not anything to detain you here; have not got any family, have you?' He said, 'I have got a son here.' He spoke of having two sisters in the East, and his brother here. He said he did not expect—well, he said, 'the way I feel, and the way this thing [referring to some litigation] worries me, I do not think I will last long.' He said he had made a will providing for his sisters, his brother, and for his son."

(g) "The boy always accompanied him to the store. I do not remember any statement he ever made with reference to the boy as to who he was. He would say, 'I want a suit for the boy.' The way he spoke I thought it was his boy, though I do not remember his saying whose boy it was. He selected the best goods, and made no objection to the price. I think I last made an overcoat, I cannot remember; it must have been ten or twelve years ago."

(*h*) " I knew Mr. Jessup in his lifetime. At one time he came and asked me the fare to San Diego. I told him, and asked him whether he was going. He said no; he was going to send some one. He said he was going to send a boy. I said, ' What boy? ' He said, ' I have got a boy as big and as old as yours.' He did not tell me where the boy was. He said he had been to college, and was going to send him to a ranch on a vacation. He asked for the ticket to be made out to Richard Miller, and it was so made. He told me that the ticket was for his boy, — his son. I asked him, ' Why do you make it out for Richard Miller?' Well, he said that he wanted to avoid trouble with a woman, or the mother, as some people at the back of her, by talking with her, were making trouble."

(*i*) " Q. Did you hear the boy call his father by any names? A. Papa. Mr. Jessup's manner was very affectionate. He would take the boy and caress him, and kiss him, bring him fruits, cakes, lady-fingers, and be very fond of him."

(*j*) " He said that she had been married, and that he did not think that he ought to look out for her any more; that he had this heir, — this boy, rather, — and he had looked out for him from his infancy and intended to look out for him, but he did not think he should be bothered with the mother. He said that he was giving the boy a schooling. He had looked out for him from infancy. · I don't think he told me who the child was with. He said he had him off at school. I think he told me that the mother had nothing to do with the boy; that he had taken care of him; that is my recollection. I said: ' Mr. Jessup, that is my boy.' He said: ' My boy is as old as your boy.' I said: ' Your boy ought to be three or four years older than mine, I don't know but more, and my boy is fully sixteen years'; and he said, ' He is.' I asked him: ' Where is your boy? What have you done with him?' ' Well,' he said, ' he is at work; it is well

enough for parents to learn their boys to go to work.' I
said: ' I agree with you; that is a good idea.' ''

(k) " He said: ' That is my boy.' He had a little boy
with him. I judged in my own mind that it was his
son at the time. He said: ' What do you think of him?'
I took him to be his son, for he looked upon him with
such pride and affection, as if he must be his child.''

(l) " He spoke to me several times about his family;
about having a son. I told him to bring him up one
time, I should like to see him. That was about five years
ago; may be a little longer. He brought him in after-
wards a couple of times, and they had dinner together.
I says to Mr. Jessup: ' You cannot deny that boy; he is
the very picture of you.' Jessup said: ' The boy puts
me to a good deal of trouble sometimes now. It don't
matter; I will never forget him.' He said he had prop-
erty on Stevenson Street and on Clay Street; some prop-
erty that he said he would make over to him. He was
sick then a great deal. He could hardly walk sometimes.
He often used to come over. He would say, ' I am not
able to walk.' He told me the boy was in the country with
friends, and that he loved the boy dearly. We were
then talking about children. I had children myself.
He said if the boy would do right, and all this and that,
he would give him everything he had got. He said that
he did not want him with him; that he would keep him
in the country. He would be better off with his friends
than he would be with him.''

(m) " I saw the child with him. The child was dressed
in a very handsome black suit, with a black cap, and had
long hair. I was going down Market, and he was going
up with the child by the hand. I asked: ' Is that the
first production? and are there any more of them?' He
said: ' No; it was the first one. Don't you think he looks
like me?' I always understood him to say that he had
the child in good hands, or was taking the best care of
him. I do not know that I ever spoke to him about the

boy more than five or ten or twenty times during our couple or three years' acquaintance. He would speak to me about how the boy was, and about how he was taking care of him. He used to speak about the boy, as ' little Dick,' or ' my little Dicky,' or ' my little boy.' ' "

(n) " One day he asked me if I know his boy; I asked him who his boy might be. He said, ' Dicky Jessup.' I said I did not know him by that name. He then said: ' He may go over here by the name of Miller; he is hiding over here.' ' Yes,' I said, ' I know him.' He said: ' If you see him, tell him to come over to see me, corner of Fifth and Market streets. I am residing there, and you will confer a favor upon me.' "

(o) " I knew the boy, who gave me his name as Richard Jessup Miller. He was sent to me from San Francisco by A. A. Denning about six years ago, when I was living on my ranch. He told me his name was Richard Jessup, but his aunt made him call himself Richard Jessup Miller. That was when he first came to my place. He was with me about six months, and then went back to San Francisco. I received several letters from Mr. Jessup. He send me money for the boy. He told me to be kind to him, and make a man of him. He returned to San Francisco at the request of Mr. Jessup, who sent him money to buy him clothing and buy him a ticket."

(p) " He said: ' O, no; there no mystery about the child. I have always taken care of the child, the boy, from his birth. I have always done for him, and always will.' I think he told me that he had him at Washington College, over at Alameda, and said: ' I have done for him. I have had him down in Lower California. I have spent large sums of money on him. I have always taken care of him, and always shall.' He seemed to want to impress on my mind the fact that he wanted to make the boy self-sustaining, self-supporting; to show him how to save money, how to make money."

(q) " I saw Mr. Jessup once with a little boy. I do

not know how old. I should think about five. He was dressed in a kind of fancy suit. I think he said: 'This is my boy.' I don't know about the word 'son.' He said the little boy or his boy— meaning his son, I presume. He did not say his son, I do not think. I said he looked very much like him."

(*r*) "He told me that he had a young boy going on two years; those were the words he used. I will not be positive now whether he said boy or son."

(*s*) "I got to speaking to him,—was very well acquainted with him,—and I told him I thought he was very well fixed for wealth. He said, 'Yes, I am well fixed.' I said, 'I suppose you have got fully one hundred thousand dollars.' He said yes, he had fully that much. I heard him speak about his son at different times; I forget the date. I said, 'When you die, you must remember me,' in a kind of joking way. 'Well,' he says, 'I have got a son that will come in for a good part of that.' Then I commenced to laugh at him. I says, 'How is that you have a son, and have no wife.' He said, 'Can't a man have kids, and not have a wife?' On one occasion he asked me if I had any family beside my little girl. I said none, with the exception of two brothers and a sister, aged fifteen, seventeen, and nineteen. 'That,' said he, 'is the age of my boy.' This was in 1885. On my expressing my surprise, he said, 'O yes; I have a son; he is across the bay.'"

(*t*) "He said that he had a fine boy by her, and that he was going to make a Dick Jessup of him. He told me the boy was in school. I cannot tell which one. He spoke about his boy that he had put at school; said that he was a fine boy, but he believed he was going to make him a great deal of trouble."

In opposition to this array of evidence, tending strongly to show an adoption, it appears that the respondent did not go by his father's name; that he lived with a colored woman, daughter of the old nurse, and

was brought up with her children and went by her name. But it appears from some of the evidence above that this might have been, not for the purpose of concealing his parentage, but through the fear that the mother of the boy, or some of the family, might assert some claim to him.

Again, it is shown that the deceased never took the boy into his family. But the evidence shows clearly that he never had any family, or any place that could be called a home. He roomed in various places in the city, and a great part of the time lived with a mistress, the wife of another man. It was to his credit, and bears strong evidence of his regard and affection for the boy, that he was not willing to subject him to the influences that had contaminated his own life.

It was also shown by a number of reputable witnesses that they had known the deceased with more or less intimacy, had met him in business, at the clubs, and at lunch, and never heard him speak of having a son. But this is testimony of a negative kind, and entitled to but little weight. Besides the fact that it appears that the deceased was a reticent man, not given to talking about his affairs, he would not be likely to discuss such a matter, under such circumstances, and if he had, the witnesses would not be likely to remember it.

There is evidence tending to show that the respondent was christened under the name of Richard Page Jessup, and that this was done at the request of the deceased, but as to the latter the evidence is conflicting.

Was this evidence sufficient to show an adoption? This depends, in part, upon the construction to be given to the two statutes in force during the time covered by the testimony.

The appellants contend that, under section 9 of the statutes of 1870, which provides for the adoption of a child "by treating, receiving, *or* acknowledging him publicly as his or their own," should be construed to

mean receiving *and* acknowledging, and that both must be proved to show an adoption. As we view the evidence, it is unnecessary to determine this question. If the testimony is sufficient to establish one of these requisites, it is equally sufficient to prove the other.

But it is further contended that the requirement that he should publicly acknowledge him as his own legitimate child is not established by proof that he acknowledged him openly to various persons as his son; that a public acknowledgment, as here used, means some formal acknowledgment of him as his legitimate son, in an open and public way, and that it is not enough to show that he made such acknowledgment to friends and acquaintances, no matter how many.

We do not so understand the statutes. To establish his right to inherit, a claimant must prove two things: 1. That he is the illegitimate child of the alleged father; 2. That he has been openly and publicly acknowledged and received, and treated *as such*. But in order to avoid imposition and fraud, the statute requires that these things shall be established by certain proof. Under the statute of 1870, it must be proof of his "*treating, receiving, or (and) acknowledging him publicly as his own legitimate child.*" That is to say, he must treat, receive, or (and) acknowledge him *as if* he were his own legitimate child; and in order that the proof may be made by disinterested parties, and fraud and imposition avoided, all of these must be done openly and publicly, and not secretly.

But this does not mean, as counsel for appellants seem to think, that the alleged father must cry out from the house-tops, "This is my illegitimate son, that I now and here publicly acknowledge as my own legitimate son," or go about with a lie upon his lips, saying, "This is my *legitimate* son."

Section 230 of the Civil Code, although differently worded, is in effect the same. The language is, "by

*publicly acknowledging it as his own, receiving it as such
into his family, and otherwise treating it as if it were a
legitimate child.*"

Undoubtedly the most satisfactory way of establishing
the necessary facts is by proof that the claimant has been
received into the family, and given the family name.

But this is not necessary where there is sufficient
proof of a reason for not having done either, as we think
is shown in this case. The deceased could not take the
respondent into his family because he had none. He
did not openly give him his name for the reason that
he feared the mother or some of her family would attempt
to take him from him. But he did give him the chris-
tian name of a favorite brother, and expressed the hope
that he might be able to raise him to be like his uncle.
In other respects he treated him as such a man might
be expected to treat his legitimate son; and that he
openly and publicly acknowledged him to be his son
there can be no doubt, if the witnesses who testified to
the facts were to be believed. Whether they were worthy
of belief or not, was for the court below to determine. He
performed toward the respondent the duties which would
have devolved upon him as the father of a legitimate
child, viz., those of protection, maintenance, and educa-
tion. Therefore he treated him as his legitimate child.

When the *status* of the respondent was thus fixed, it
could not be affected by subsequent acts of the deceased,
by failing to name him in his will, or otherwise. The
statute, together with such acts done under it as will
constitute an adoption, fix the *status* of the illegitimate
child irrevocably. (*McGanigle* v. *McKee*, 77 Pa. St. 81;
*Hosser's Succession*, 37 La. Ann. 839.)

It is said that the statutes under which the respondent
claims to have been adopted were enacted after the will
of the deceased was executed, and therefore the adoption,
if proved, cannot affect the rights of parties named as
legatees in the will, but the will gave no vested right at

the time of its execution, and for that reason, if for no other, the point is not well taken. (*Sewall* v. *Roberts*, 115 Mass. 262.)

The evidence is sufficient to sustain the order of distribution.

Order affirmed.

Sharpstein, J., Paterson, J., and Beatty, C. J., concurred.

McFarland, J., and Thornton, J., dissented.

After the rendition of the opinion of the 30th of November, 1889, the respondent moved to vacate the judgment entered thereon, and for the issuance of a *remittitur* in accordance with the opinion of the 1st of July, 1889. On this motion the following opinions were rendered on the 20th of December, 1889: —

Beatty, C. J.—This cause was originally submitted to the court in Bank without any previous decision or hearing in either of the Departments.

On July 1, 1889, a decision was rendered, concurred in by a constitutional majority of the justices, affirming the decree of the superior court. On the 31st of July we decided to grant the petition of the appellants for a rehearing. No order in writing directing such a rehearing was signed by any of the justices, but the clerk was directed to enter the order in the minutes of the court, and on that day he made an entry in the minutes in the following form:—

"In Bank.—Estate of Jessup. No. 12941. Rehearing granted.　　　　　　　　By the Court."

Subsequently, in pursuance of this order and without any objection to its sufficiency, the cause was reargued and again submitted for decision. On November 30, 1889, a second decision was rendered reversing the decree of the superior court and our own former judgment.

The respondent now moves to vacate and annul this second judgment, on the ground that it was "made improvidently and without color of law," and demands the issuance of a *remittitur* upon the judgment of July 1st. His motion is based upon the ground that said judgment of July 1st became final and irrevocable on July 31st, by reason of the fact that no order granting a rehearing of the cause was made on or before that day, in conformity to the requirements of section 45 of the Code of Civil Procedure, which reads as follows:—

"Sec. 45. The chief justice or any four justices may convene the court in Bank at any time, and the chief justice shall be the presiding justice of the court when so convened. The presence of four justices shall be necessary to transact any business, and the concurrence of four justices present at the argument shall be necessary to pronounce a judgment in the court in Bank, provided, that if four justices so present do not concur in a judgment, then all the justices qualified to sit in the cause shall hear the argument, but to render a judgment a concurrence of four justices shall be necessary; *and every judgment of the court in Bank shall be final, except in cases in which no previous judgment has been rendered in one of the Departments, and in such cases the judgment of the court in Bank shall be final, unless within thirty days after such judgment an order be made in writing, signed by five justices, granting a rehearing.*"

Most of this section and of several preceding sections consists of a mere repetition in substance of express constitutional provisions (article 7, sections 2, 3); but the part italicized is not contained in the constitution, either in substance or in form. Nevertheless, it may be valid and obligatory as a statute, and undoubtedly is so unless it conflicts with the constitution.

Therefore, since it has not been complied with in granting the rehearing in this case, it becomes necessary to determine whether or not it is constitutional.

·The question is by no means a new one.   The provision above quoted was adopted as an amendment to the code April 1, 1880, and naturally became the subject of consideration by the court within a short time after its enactment.   The court at that time was composed of the seven justices first chosen by the people of the state to administer the new constitution and the laws passed in pursuance of it.   They decided, without a dissenting voice, so far as the records of this court show, and so far as can be learned from any source of information accessible to me, that the provision in question was invalid, and they continued after the act, as before it, to grant rehearings by orders entered in the minutes of their proceedings.   The same practice has been continued without change or interruption to the present time; and during the year that I have occupied a seat upon the bench, its propriety has not been questioned, until now, by any member of the court, or by any party to a cause depending here.   It has not, however, always passed unchallenged.   Our records show that on at least two occasions formal objection has been made by the prevailing party to the order granting a rehearing on the ground that it was not made in the form prescribed by this statute.

In the great case of *Lux* v. *Haggin*, decided in 1884, and reported in 69 Cal. 255,—a case which directly involved interests of very great magnitude, and, as a precedent, affected the rights of a large portion of the land-holders of the state,—the decision was made by the court in Bank without a previous hearing in Department.   A bare majority of the members of the court concurred in reversing the decree of the superior court, and on petition of respondent a rehearing was granted by a minute order in precisely the same form as the one made in this case.

Counsel for appellant in that case, without waiting for a reargument, promptly made the objection that the or-

der granting the rehearing was void, and demanded the issuance of a *remittitur* upon the judgment already rendered. This motion was made and submitted to the court in February, 1885, and by the court overruled.

It is true that no reasons were assigned by the court for its conclusion, but no member of the court—divided as it was and continued to be as to the merits of the case—dissented, and the point was clearly and necessarily decided that an order like that in question here was valid, and had the effect of putting the case in the same position as if it had never been decided or submitted.

Again, in the case of *Bull* v. *Coe*, which was originally submitted to the court in Bank, the judgment was affirmed in 1887. Subsequently a rehearing was granted by a minute order entered in identically the same form as the order here. Counsel for respondent, in their printed argument on the rehearing, made the objection that the judgment of affirmance had become final by reason of the failure of the court to file an order in writing signed by five justices. The court nevertheless proceeded upon rehearing to reverse the judgment appealed from and its own previous judgment, just as has been done in this case, merely remarking, in response to the objection to the order: "The position as to the power of the court to grant a rehearing, and the sufficiency of the order granting it, do not require special notice." (77 Cal. 63.)

It is to be regretted that the court in deciding these motions did not set forth explicitly the grounds of its decision, as it would probably have prevented a recurrence of the question. The omission to do so was probably due to the fact that then as now the time of the court was so fully occupied in formulating opinions upon cases in which a statement in writing of the grounds of its decision was made obligatory by the constitution, that it could with difficulty spare the time to state fully and at large its reasons for deciding a motion involving

only a question as to the form of making its orders,—a question upon which no litigant could by any possibility need either information or caution for the purpose of any action to be taken by him.

But however that may be, it is plain that the question has been twice distinctly decided in determining contested motions. It has also been decided by the uniform and unvarying practice of the court in passing upon a great number of petitions for rehearing during the period of almost ten years since the adoption of the amendment under consideration. If any course of construction could settle a question of practice, it seems to me that this must be regarded as settled, irrespective of any doubt that may now be entertained as to the correctness of the original decision. If the question was originally doubtful, it has been resolved too often in one way to admit of an opposite solution now, even if the opinion of the court should change. At least we should not visit the consequences of our inconsistency upon litigants, though we should feel constrained to change our practice. The rights dependent upon orders that we *have made* are protected by the rule *stare decisis*.

But I do not feel it necessary in this matter to rest upon the doctrine of *stare decisis*, or upon the mere authority of the former members of this court. There is certainly a sufficiently strong presumption that they were right in their decision; but aside from such presumption. I think its correctness may be easily shown.

The jurisdiction of this court is derived from the constitution, and can be neither enlarged nor abridged by the legislature. What it was in the beginning it remains, and it must remain until the constitution itself is changed. If the constitution has denied to this court the power to grant rehearings in causes that have been decided in Bank, the legislature cannot confer the power. If the constitution has conferred the power, the legislature cannot take it away, or by pretense of regulating

its exercise substantially impair it. And whatever matters are by the constitution committed to the jurisdiction of the court, the court may by a constitutional majority—that is to say, by the voice of four of its seven justices—decide. The legislature has no more right to say that we shall not decide a matter within our jurisdiction, unless five justices subscribe an order in writing, than we should have to require all acts of the legislature to be subscribed by two thirds of the members of each house. The constitution has conferred the power of deciding all matters within our jurisdiction upon a majority of the court; the legislature cannot require more than a majority.

If these propositions are true, it only remains to inquire whether, under the constitution, and wholly independent of legislation, we have the power to grant rehearings in cases that have been decided by the court in Bank.

The constitution of 1849 conferred certain appellate jurisdiction upon a supreme court composed of a chief justice and two associate justices. By the amendment of 1863 a slightly different jurisdiction was conferred upon a supreme court composed of a chief justice and four associate justices. By the present constitution, adopted in 1879, substantially the same jurisdiction was committed in substantially the same terms to a supreme court composed of a chief justice and six associate justices. That is to say, certain cases were enumerated in which it was declared the supreme court should have appellate jurisdiction. This was all the framers of the constitution thought it necessary to say. They did not pretend to define appellate jurisdiction, nor did they undertake to prescribe in detail what orders and judgments the court, in the exercise of its jurisdiction, might make. They assumed, what was undoubtedly true, that the term "jurisdiction" had a well-defined and well-understood meaning. If this had not been so, the

constitution would have been without meaning, and if, in the absence of any definite provision in the constitution, it had rested with the legislature to prescribe the powers and duties of the courts, as well as their mode of procedure, the judicial department, instead of being co-ordinate and independent, would have been entirely subject to the will of the legislature. No one, of course, contends at this day for such a proposition, and the only possible controversy is as to the extent of the power implied *ex vi termini* by the phrase "appellate jurisdiction." That this embraces the right to review the final judgments of the courts of original jurisdiction, — the right, in other words, to reverse, affirm, or modify them, and to enforce by some appropriate mandatory process the judgment of the appellate tribunal,— will scarcely be denied. And yet the legislature has assumed to confer upon this court by statute these identical powers. (Code Civ. Proc., sec. 53.) This is only one of many instances in which provisions have been incorporated into the statutes, which, either in express terms or by necessary implication, are contained in the constitution itself, and we cite it because it is referred to by counsel in support and illustration of their argument that powers conferred upon this court by the legislature may be by the legislature regulated, limited, and restricted. It may be conceded that, in so far as the legislature can confer upon the courts created by the constitution powers that they do not possess independent of legislation, such powers may be limited and restricted to any extent, but the fact that the legislature has assumed to confer a power upon a court does not prove that the power rests upon legislative authority. This will be more clearly apparent if we suppose a statute to have been passed, which, instead of authorizing this court to affirm, reverse, or modify the judgments of the superior courts, had declared that we *should not reverse or modify* such judgments unless five justices concurred

in the order. Would any one contend that such a law was constitutional? Certainly not. And why? Merely because this court derives from the constitution the power as a court speaking by a constitutional majority of four of its members to decide causes, and the power to decide includes the power to reverse or modify the judgment appealed from.

We need not, therefore, have been embarrassed by the fact, if it had been a fact, as counsel contend, that the legislature has undertaken to give this court the power to grant rehearings in causes that have been decided in Bank. But in truth the legislature has not assumed to confer the power. On the contrary, the statute relied on (Code Civ. Proc., sec. 45), above quoted, assumes the *existence of the power*, and merely attempts to restrict the court in the mode of exercising it. On this point the court and the legislature are at one; they agree that, under the constitution, and independent of statute, the power exists.

If so, what is its origin? Necessarily the constitution; and as it is not expressly mentioned in the constitution, it must owe its existence to the principle that it is one of the inherent powers of every appellate court to revise, to modify, and to correct its judgments, so long as they are under its control.

There is abundant authority for this proposition. The practice of the supreme courts of many of our sister states and of the supreme court of the United States is in accord with it, and rests upon no other foundation. But I need only refer to the decisions of the supreme court of this state under former constitutions; for it is in the light of these decisions that the new constitution must be read.

In the case of *Grogan* v. *Ruckle*, decided in 1850, and reported in 1 Cal. 183, the judgment of the district court had been reversed, and before issuance of a *remittitur* a rehearing ordered. Afterwards, and notwithstanding

the order for a rehearing, a *remittitur* was improperly issued and sent to the district court. On the rehearing, counsel for appellant challenged the power of the court to grant a rehearing after judgment. In delivering the opinion of the court, Judge Burnett said: " On the reargument of this cause, the objection was taken by appellant that this court cannot, after its judgment has been pronounced, direct a rehearing.

" Section 280 of the Practice Act provides 'that after an appeal shall have been heard and determined, the judgment or order of the supreme court therein, and all things concerning the same, shall be remitted to the district court of the proper county, and thereupon such further proceedings shall be had in that court as may be necessary to carry such judgment or order into effect.'

" Section 18 of the act organizing this court is to the same effect. It declares that 'the supreme court may reverse, affirm, or modify the judgment or order appealed from, and its judgment shall be remitted as soon as practicable, after judgment pronounced, to the court below, to be enforced according to law.'

" We are of opinion that this court loses jurisdiction of the cause when the *remittitur* has been sent to and filed in the court below; but that our control over the cause does not cease until that has been done; and so are the decisions of courts, the jurisdiction and powers of which are analogous to those of this court. (*Burkle* v. *Luce*, 1 N. Y. 240; *Martin* v. *Nelson*, 1 N. Y. 241; *Delaplaine* v. *Bergen*, 7 Hill, 591.)

" In this cause, the *remittitur*, it appears, was filed with the clerk of the district court ' on or before ' the twenty-fifth day of December last; but the order for a rehearing was made and entered on the eighteenth day of the same month, when the court had jurisdiction of the cause and the power to make the order. The *remittitur* was improperly sent to the district court after the entry of the

order granting a rehearing, and such act ought not to be permitted to supersede the order."

This decision was made under the constitution of 1849, which contained not one word on the subject of rehearings, and under statutes which provided, in substance, that when an appeal had been heard and determined the judgment or order of the supreme court should be remitted as soon as practicable to the court below. The only principle upon which it could be sustained was that above stated, viz., that the power to grant rehearings is inherent,—is an essential ingredient of jurisdiction, and ends only with the loss of jurisdiction. And this principle so established in the jurisprudence of California was followed down to the adoption of the present constitution without deviation, not only in the numberless instances in which it was acted upon without express reference to its origin, but also in several cases in which it was more or less fully discussed. In all of the cases the doctrine consistently maintained is this: that from the time an appeal has been perfected until a *remittitur* has been regularly issued and transmitted to the lower court, the jurisdiction of the case is in this court, and that we have the power to make any proper order concerning it, including an order for a rehearing. As the law did not fix a precise time after judgment for the issuance of the *remittitur,* the court at first made a standing rule that no *remittitur* should issue short of ten days after judgment, except by consent, and this, for the purpose of affording to the losing party an opportunity of moving for a rehearing, or for an amendment or modification of the judgment. (*Blanc* v. *Bowman,* 22 Cal. 26.)

After the reorganization of the court under the amended constitution of 1863, which, like the old constitution, was silent on the subject of rehearings,—substantially the same statutory provisions remaining in force,— the time for filing petitions for rehearing was extended by rule of court, and it was likewise provided

that no *remittitur* should issue until the time for peti-
tioning had expired, and that the filing of the petition
.should operate a stay of proceedings until the deter-
mination of the motion. (Rules of supreme court as
amended January 3, 1866, printed as an appendix to
volume 28 California Reports, pages 708, 709. See also
*Mateer* v. *Brown*, 1 Cal. 231; *Leese* v. *Clark*, 20 Cal. 387;
*Rowland* v. *Kreyenhagen*, 24 Cal. 52.)

This being the uniform course of practice and decis-
ion in the highest court of the state for thirty years pre-
.ceding the formation of the present constitution, it may
safely be assumed that if the framers of that instrument
had intended .to deny or qualify the long-asserted doc-
trine .of the inherent power of the supreme court to
order rehearings after judgment, they would have in-
corporated in the constitution some express provision
clearly evincive of such intention. The force—the
conclusiveness — of this argument has not been over-
looked by counsel for the respondent, who meet it with
the assertion that the new constitution has prohibited
rehearings of causes decided in Bank, not, they concede,
in express terms, but, as they claim, by necessary impli-
.cation. In support of this proposition, they cite the
provisions of section 2, article 6, in regard to rehearings
after decision in Department, and they say this express
provision that a cause decided in Department may be
reheard in Bank is an implicit prohibition of any other
rehearing.

The trouble with this argument is, that it proves too
much. If the constitution has in any manner prohib-
ited all rehearings, except in cases decided in Depart-
ment, the legislature cannot authorize them; the legisla-
ture cannot confer a power inhibited by the constitution.
We have seen, however, that, not only has this court
constantly assumed the right ·to grant rehearings after
decision in Bank, but the legislature itself has recognized
the existence of the power in the very statute by which

it has sought to limit and regulate it.   And not only is
this contention of counsel opposed to all authority,
legislative and judicial, but it is wholly unsupported
by any inference deducible from the section of the con-
stitution upon which they rely.   The framers of the
constitution in authorizing the supreme court to sit in
two Departments made it absolutely necessary that the
relations of the Departments to the court, and the extent
of their dependence upon it, should be exactly defined.
Without express provision as to the effect and conclu-
siveness of Department decisions we should have had
two independent supreme courts, following possibly two
conflicting lines of decision.   To prevent this inconve-
nience in the only way it could be prevented, Department
decisions were made conclusive only upon condition that
a rehearing in Bank should not be ordered.   This regu-
lation of a matter imperatively demanding regulation
in view of the powers conferred upon the Departments
by no means implies an intention to deprive the court
in Bank of a power well understood to be inherent in it,
and essential to a proper discharge of its functions.

But, conceding the power of the court to order rehear-
ings after. judgment in Bank, counsel contend that the
legislature has the undoubted right to regulate the exer-
cise of such power, and that section 45 of the Code of
Civil Procedure does nothing more. . We concede, to
quote the language of Chief Justice Wallace (*Ex parte
Harker*, 49 Cal. 467), that "the mere procedure by which
jurisdiction is to be exercised may be prescribed by the
legislature, *unless, indeed, such regulations should be found
to substantially impair the constitutional powers of the courts,
or practically defeat their exercise.*"   We concede the power
to regulate, but not the power to take away or defeat, the
exercise of jurisdiction.   And this, in our opinion, the
legislature has, by the section referred to, attempted to
accomplish.

The law, by its very terms, assumes the existence under

the constitution of the power to grant rehearings after judgment in Bank, and then proceeds to prohibit its exercise in one class of cases, and in another to require for its exercise the concurrence of more than a constitutional majority of the court.

That this is an attempt to impair the constitutional power of the court seems to admit of no doubt. The legislature may have the right to prescribe the time for the issuance of *remittiturs* upon the judgments of this court, and if so, it could, by making provision on that subject, limit our power — as to time — to grant rehearings. But for forty years the time of issuing the *remittitur* has been left to the court to regulate; and rules have been made fixing the period after judgment during which the *remittitur* should be retained. During such period it has been held without question that the jurisdiction of this court to make any proper order in the case was preserved. It would be very remarkable if it should now be discovered that this court has for forty years been acting upon an erroneous view as to the proceeding by which its jurisdiction over a cause is terminated.

There is, moreover, no consideration of justice or expediency calling for a change of view in regard to this matter.

Our rule and practice create no uncertainty or confusion as to when our judgments become final and conclusive. By a standing order all *remittiturs* are directed to issue thirty days after judgment, and we have never heard that this has been found unreasonable delay. The losing party avails himself of the opportunity afforded by the rule to petition for a rehearing. If we are satisfied, from the petition, that, owing to any mistake of law or misunderstanding of facts, our decision has done an injustice in the particular case, or if the principle involved is important, and the decision will make a precedent establishing a rule of property or of right, and it is seriously doubted whether we have correctly decided,

we grant a rehearing. The effect of this is, no doubt, to cause some inconvenience and delay to the parties interested, but this inconvenience is less to be dreaded than the greater inconvenience of making a bad precedent, or the injustice of allowing a decision to stand which we believe to be wrong. However, the question for decision here is not the expedience of the system, but the source of the power and the extent of the right to grant rehearings. As to that, we have sufficiently stated the grounds upon which we hold: —

1. The perfecting of an appeal gives us jurisdiction of a cause, and that jurisdiction lasts until a *remittitur* is regularly issued;

2. While the cause remains subject to our jurisdiction we have the power derived from the constitution to grant a rehearing after judgment, just as we have the power independent of legislative enactment to reverse, affirm, or modify the judgment of the inferior court and to enforce our own judgments;

3. By the constitution, a majority consisting of four justices may decide any matter within our jurisdiction; and an act of the legislature requiring more than four justices to concur in a decision is unconstitutional.

These propositions are decisive of this motion, and they are sustained by many decisions of this court, and by its uniform course of practice since the organization of the state government. In one single case (*Hegard v. Cal. Insurance Co.*, 72 Cal. 535), in an opinion by *the court,* after deciding that the record presented no ground for granting a rehearing, it is held that *the right to petition* for a rehearing will not be recognized in cases decided in Department and afterward in Bank. Preliminary to this conclusion some reference is made to the silence of the constitution on the subject of rehearings, and to the terms of section 45 of the Code of Civil Procedure. But this was only for the purpose of showing that the petitioner *had no absolute right to be*

*heard,* a decision as to the power of the court to grant the rehearing being expressly reserved. This is the only evidence I have been able to discover in the reported decisions of the court that any member of it ever doubted its inherent power to grant rehearings. Since I became chief justice I have found that one or two of my associates entertained doubts as to the power of four justices to grant a rehearing after decision in Bank, and for that reason no such order has been made without the concurrence of five justices, but this has happened simply because in all cases in which four justices have strongly favored a rehearing another justice has added his vote for the purpose of giving the order unquestioned validity, after which it has been entered as an order of the court.

In this case the order was made with the concurrence of five justices, viz., justices McFarland, Thornton, Sharpstein, Fox, and myself, and it was an order eminently proper to be made. The case was of great importance, not only in the magnitude of the interests directly involved, but still more so as a precedent. It was originally argued before only six justices of the court, and submitted along with more than a hundred other cases, many of them of great importance, all requiring to be decided within a period of ninety days. The record of this case covers 444 printed pages, almost the whole of which consists of the condensed report of conflicting testimony, upon the effect of which the correctness of the judgment depended. Besides the time required for the consideration of the conflict of the evidence, important questions of law were involved. The printed argument of counsel upon these questions of law and fact covered 439 pages, in which were cited numerous decisions of other courts. Such being the case, and considering the multiplicity of other demands upon our attention, the time allowed for its consideration was far from abundant. After such consideration

as we were able to give the case, a majority of the court concurred in the decision that was made, the other members dissenting. Under such circumstances, no reasonable man can doubt the propriety of subjecting it to further examination and deliberation, and the fact that, after reargument, our former judgment was reversed, so far from proving that the order was improperly made, is a complete vindication of its propriety. If we are never to change our opinions after reargument, it would be. difficult to suggest a reason for granting a rehearing.

Motion denied.

McFARLAND, J., FOX, J., THORNTON, J., and SHARP-STEIN, J., concurred.

PATERSON, J., concurring.—I concur in the order, and in all that is said by the chief justice, except the reasons given in support of the order granting a rehearing. I did not think a rehearing should be granted, and therefore voted against it.

As a matter of fact, *five justices voted for a rehearing in this case*, and the only thing really involved in·the question debated at the bar is, whether their official act was sufficiently authenticated without an order in writing, signed by them, or by four of them,— that is to say, whether it was sufficiently authenticated by an order purporting to emanate from the court. This question has been foreclosed by former decisions; claims to property of great magnitude have been established and denied upon the construction thus placed upon the power of the court; and as all orders thus made would be rendered absolutely void by a judicial change of front on the proposition, and numberless judgments be set aside after it is too late to do justice between the parties, the exigencies of the case imperatively demand the application of the rule *stare decisis*.

WORKS, J., dissenting.—I cannot concur in the conclusion reached by the majority of the court, nor in the

reasoning upon which it is founded; and considering the magnitude of the interests involved, and the importance of the question presented, it is proper that I should give my reasons for this dissent.

The Code of Civil Procedure provides:—

"Sec. 45. The chief justice, or any four justices, may convene the court in Bank at any time, and the chief justice shall be the presiding justice of the court when so convened. The presence of four justices shall be necessary to transact any business, and the concurrence of four justices present at the argument shall be necessary to pronounce a judgment in the court in Bank; *provided*, that if four justices so present do not concur in a judgment, then all the justices qualified to sit in the cause shall hear the argument; but to render a judgment, a concurrence of four justices shall be necessary; and every judgment of the court in Bank shall be final, except in cases in which no previous judgment has been rendered in one of the Departments, and in such cases the judgment of the court in Bank shall be final, unless within thirty days after such judgment an order be made in writing, signed by five justices, granting a rehearing."

It will be observed that this section provides, in direct and unequivocal terms, that the "judgment of the court in Bank shall be final, unless *within thirty days* after such judgment an order be made *in writing, signed by five justices*, granting a rehearing."

The statute needs no construction. It cannot be misunderstood. If it is a valid statutory provision, this court should respect it, and hold itself bound to comply with its requirements. But it is contended that it is invalid, and consequently not binding upon the court, for three reasons: 1. Because it is an attempt to interfere with and abridge the constitutional powers and jurisdiction of the court; 2. Because it attempts to limit the inherent powers of the court; 3. Because this court

has uniformly held that it is not a valid enactment, and this construction of the statute has thereby become a part of the law of the state, and binding upon the court and litigants.

I shall consider these propositions in their order.

A complete answer to the first of these contentions is,.that this court has no constitutional jurisdiction or power to grant a rehearing where a cause is heard in Bank. The only provision of the constitution relating to rehearings is as follows: "The chief justice shall apportion the business of the Departments, and may, in his discretion, order any cause pending before the court to be heard and decided by the court in Bank. The order may be made before or after judgment pronounced by a Department; but where a cause has been allotted to one of the Departments, and a judgment pronounced thereon, the order must be made within thirty days after such judgment, and concurred in by two associate justices; and if so made, it shall have the effect to vacate and set aside the judgment. Any four justices may, either before or after judgment by a Department, order a case to be heard in Bank. If the order be not made within the time above limited, the judgment shall be final. No judgment by a Department shall become final until the expiration of the period of thirty days aforesaid, unless approved by the chief justice in writing, with the concurrence of two associate justices." (Const., art. 6, sec. 2.)

The evident intention of this constitutional provision was to limit the right to grant rehearings to cases heard and decided in Department. This is apparent, not only from the fact that a rehearing is provided for in such cases only, but because it is provided that such judgments shall not be final until thirty days after their rendition, leaving it to be understood that all other judgments of the court shall be final from the time they are pronounced. But it is enough for the purposes of this

case to say that the constitution does not confer upon the court the right to grant rehearings of cases decided in Bank. That it does not confer such power has been expressly decided in *Hegard* v. *California Ins. Co.*, 72 Cal. 535, 540, in which it was said: "The petition is denied for the reasons,—1. That an examination of the record shows no sufficient cause therefor; and 2. *That the constitution does not provide for a rehearing of causes decided in Bank,* and the statute (Code Civ. Proc., sec. 45) expressly provides that every judgment of the court in Bank shall be final, except in cases in which no previous judgment has been rendered in one of the Departments."

The rules of this court are now, and always have been, consistent with the idea that rehearings can only be had in cases heard in Departments. They provide for the procedure in applications for rehearings in such cases, and none other. (Rule 30.)

Having thus demonstrated that the court has no *constitutional* authority to grant rehearings in this class of cases, I need not dwell further on this point. If such power were given by the constitution, and the provision of the code under consideration would have the effect to take away, limit, or abridge such jurisdiction, it would be invalid beyond any question. (*Haight* v. *Gay*, 8 Cal. 300.)

The case of *State* v. *Noble*, 21 N. E. Rep. 244, relied upon by the appellant, decides nothing more than this.

Whether it would have that effect or not will be considered hereafter.

This brings us to the second question: Has this court the *inherent* power to grant rehearings? and if so, can that power be limited, controlled, or *regulated* by the legislature?

Inherent power is defined to be "an authority possessed without its being derived from another; a right, ability, or faculty of doing a thing without receiving

that right, ability, or faculty from another." (Bouvier's Law Dict. 710.)

This court is as much a creature of the constitution and laws of the state as the lowest judicial tribunal in it. It cannot go beyond its constitutional jurisdiction, and that jurisdiction, as we have seen, is beyond the reach of the legislative department of the state government. But is this so of the *inherent* powers of the court?

If the inherent power resting in the court is 'one necessary to the preservation of its existence as a court or the performance of its constitutional duties and functions, it stands upon the same footing as the power expressly conferred by the constitution, and should be guarded against legislative encroachments for the same reason. If it is not of such a nature, in my judgment the power cannot stand as against an express statutory enactment. To that class of inherent powers which are necessary to the preservation and proper discharge of the duties of the court belongs the right to punish for contempt, — a power that is uniformly upheld and jealously guarded by the courts. It is held that the legislature cannot deprive the courts of this power, or materially limit or abridge it. But it will be found on an examination of the cases upholding this doctrine that the power is maintained on the ground that its exercise is necessary to the existence and preservation of the courts, and the proper discharge of their duties. (*Niel* v. *State*, 9 Ala. 259; *State* v. *Morrill*, 16 Ala. 384; *People* v. *Willson*, 64 Ill. 195; 16 Am. Rep. 528; *Ex parte Biggs*, 64 N. C. 202; *Clark* v. *People*, 1 Breese, 340; *Little* v. *State*, 90 Ind. 338; 46 Am. Rep. 224.)

The power of a court to vacate its judgments properly rendered, and not affected by fraud or mistake, does not belong to this class, if we admit the existence of the right as one inherent in the court. That courts have the inherent power to vacate or set aside their judgments which have been procured by fraud or mistake, correct their

records to make them speak the truth, prevent the abuse of their authority or process, and enforce obedience to their mandates, may be conceded. (Freeman on Judgments, secs. 99, 100.)

So they may, where jurisdiction is given them, but no procedure is presented by which such jurisdiction may be exercised, provide such procedure. (*People* v. *Jordan*, 65 Cal. 644.) But where a mode of procedure is provided by the legislature, this power is thereby taken away from the courts.

All of these rest upon the same principle precisely. They are permitted and exercised as powers necessary to the proper exercise of the jurisdiction expressly conferred upon the court.

I know of no authority or reason for the doctrine asserted in this case, that a court has the inherent and uncontrollable power to vacate and set aside its judgment, rendered in accordance with the law, and not tainted with fraud or mistake.

The ground, and the only ground, upon which the right is maintained, where the judgment is the result of fraud, mistake, or inadvertence is, that the judgment is *not* the judgment of the court. In such cases it is due to the court, as well as to the parties, that the pretended, or apparent, judgment be vacated. But this is not a rehearing in any proper sense. It is to relieve the party from a judgment rendered without a proper hearing, and is allowed because the injured party has no remedy by the ordinary course of appeal, or writ of error, no error appearing on the face of the record. (Freeman on Judgments, secs. 99, 100; *Sanders* v. *State*, 85 Ind. 318, 328; 44 Am. Rep. 29; *Nealis* v. *Dicks*, 72 Ind. 374.)

The reason for according to a court the right to vacate its judgments on this ground has no application to a case like this, where the cause has been fully and fairly heard and decided on its merits. In such a case there is no ground for equitable relief, a rehearing cannot be de-

manded as a right, and the court has no inherent power to vacate the judgment, except in the manner provided by the statute. (*Nealis* v. *Dicks*, 72 Ind. 374.)

But let us concede, for the purposes of this case, that the power exists without constitutional or statutory authority. The question remains, whether the statute is an infringement of the power. The statute contains three requirements: 1. Action must be taken in granting the rehearing *within thirty days;* 2. It must be by *an order made in writing;* and 3. Be *signed by five justices.* (Code Civ. Proc., sec. 45.) A part of this section may be valid, and the balance invalid. As to the first of these requirements,— that action must be taken within thirty days,— its validity has never been questioned, and this court has acted in conformity to it from the time of its enactment until the present day. I regard it as a proper and reasonable limitation on the power of the court, conceding that the power exists, and it has been so regarded and acted upon by the court.

As to the second requirement, it is eminently just and right that the action of the court should be put in some tangible form that will give evidence to the parties interested, and the public generally, that its duty has been properly and legally performed. A court of justice is not a star-chamber tribunal, that its action, or that of any one of its members, should be kept secret.

The third requirement is open to more serious question. If the court had been acting in the discharge of a duty imposed upon it by the constitution, a majority of the court would have the right to act. If so, it may be claimed with much more force that a statute requiring a greater number to concur in the action taken would be to limit and abridge the powers of the court, and if this statute related to such an exercise of jurisdiction, it would be unconstitutional for that reason. A statute of the state of New Jersey provided that no judgment of the supreme court should be reversed

unless a majority of those members of the court of errors and appeals who were competent to sit on the hearing and decision of the case should concur in such reversal. This statute, which went directly to the jurisdiction and power of the court to render a judgment, and allowed a judgment to be rendered by *less* than a majority of the court, but denied it to the majority in certain cases, was held to be unconstitutional. But even in so strong a case the decision was by a bare majority, the court standing seven to six. (*Clapp* v. *Ely*, 27 N. J. L. 622.) The reason for this rule is thus stated: "And as a court must act as an organized body of judges, and where differences of opinion arise, they can only decide by majorities, it has been held that it would not be in the power of the legislature to provide that, in certain contingencies, the opinion of a majority of a court, vested with power by the constitution, should prevail so that the decision of the court in such cases should be rendered against the judgment of its members." (Cooley on Constitutional Limitations, 5th ed., 115.)

But as the action taken on the motion was not in pursuance of any constitutional authority vested in the court, and was not necessary to the proper discharge of its constitutional duties, I am of the opinion that the legislature had the power to say that more than a bare majority of its members should be necessary to set aside its judgment duly rendered by a constitutional majority of the members competent to sit in the case.

The supreme court of the United States exercises the right to grant rehearings, but ordinarily a rehearing is never granted in that court unless it is moved for by a justice *who concurred in the decision*, and not then, except by a majority of the court. If not so moved for, it is denied as of course. (*Brown* v. *Aspden*, 14 How. 25; *Public Schools* v. *Walker*, 9 Wall. 603; *Ambler* v. *Whipple*, 23 Wall. 281.)

With respect to the requirement of the statute that

the order for a rehearing shall be made in writing and signed by the justices voting in favor of it, there can, in my judgment, be no question as to its validity and binding force. It neither takes away nor abridges the jurisdiction of the court, but provides for the procedure, and determines what shall be sufficient evidence that the rehearing has been granted. If the legislature cannot require this, it has no power to say to a superior court that its judgments shall be in writing and entered of record; that it shall make its findings of facts and conclusions of law in writing; that it shall charge a jury in writing, or in any other way control the manner in which it shall act or the mode of its procedure. It cannot say that the verdict of a jury shall be in writing, signed by its foreman, or otherwise provide for the conduct of a case. The right of the legislature to control and provide for the procedure of the courts, in respect even to their inherent powers, as in the matter of contempt, has always been recognized by this court, and by the courts of other states. (*Warner* v. *Hall*, 1 Cal. 90; *Sacramento etc. R. R. Co.* v. *Harland*, 24 Cal. 336; *Ex parte Harker*, 49 Cal. 466; *Fabretti* v. *Superior Court*, 77 Cal. 305; *Bachelder* v. *Moore*, 42 Cal. 414; 44 Cal. 478; *Johnson* v. *Superior Court*, 63 Cal. 578; *Ex parte Henshaw*, 73 Cal. 486, 496.) But the legislature cannot take away the power to punish for contempt, or declare that any act which amounts to a contempt shall not be punished as such. (*Little* v. *State*, 90 Ind. 338; *Hahnan* v. *State*, 105 Ind. 515.)

In *Ex parte Harker*, *supra*, this court said: "The powers of the district court, whether sitting in equity or at law, to arrest a defendant on a civil action, are defined by the code, and the writ by which and the proceedings upon which such an arrest is to be effected are therein prescribed, and the writ of *ne exeat* is not one. Nor is there any force in the suggestion made at bar that it was not competent to the legislature to

abolish the writ, because jurisdiction in equity cases is conferred upon the district courts by the constitution. Jurisdiction is also conferred by the constitution upon those courts in certain cases at law; but it is apparent, in equity no less than at law, that the mere procedure by which jurisdiction is to be exercised may be prescribed by the legislature, unless, indeed, such regulation should be found to substantially impair the constitutional powers of the courts, or practically defeat their exercise."

There can be no pretense that the provisions of the statute under consideration could " substantially impair the constitutional powers of the courts, or practically defeat their exercise."

" The filing of a petition for a rehearing is not a matter of right. It is a privilege given by the court, governed and limited entirely by its rules. *The power to make these rules is given and controlled by the statute.* The court, equally with the suitor, is bound by them until they are abrogated. We must construe them as statutory provisions would be construed." (*Hanson* v. *Mc-Cue*, 43 Cal. 178.) But as I have observed, there are no rules of the court affecting or authorizing petitions for rehearings in cases decided by the court in Bank, and if there were, such rules must conform to and would be controlled by the statute. (Code Civ. Proc., sec. 129; *People* v. *McClellan*, 31 Cal. 101.)

As to the wisdom of these restrictions upon the power of the court, there should be no two opinions. The liberality of the court in granting rehearings needs some check, and while the court has, with a sincere and conscientious desire to do justice to litigants, added largely to its labors by hearing cases more than once, I am of the opinion that it would be much better for the court and litigants if the right to a rehearing were denied in all cases decided in Bank, where the cause had been fully and fairly heard on its merits. The wisdom of this

statutory provision, and the expediency of a too liberal exercise of the power to grant rehearings, are fully exemplified in the proceedings in this case and their results. When the case was submitted on oral argument, the court consisted of six members, who alone were competent to participate in a decision. The cause was affirmed, the court standing four to *two*. In the mean time a newly appointed justice had become a member of the court. He was incompetent to participate in the decision of the case, although a member of the court at the time the decision was rendered, because of the fact that he was not present at the argument. (Const., art. 6, sec. 2.) His competency to act upon a petition for a rehearing is a matter of serious question. But conceding his competency, he did not hear the argument. The petition for a rehearing must, under the practice of this court, be heard *ex parte*. The respondent could not be heard, and need not be notified of the application. As to a part of the court, therefore, the judgment was vacated and set aside without any opportunity given him to be heard, and, in my judgment, in a manner not authorized by law. The positive hardship, not to say injustice, of such a proceeding must be apparent. The judgment having been set aside, a rehearing was had, and the cause was reversed, the court standing four to *three*. So that so far as mere numbers was concerned the decision was weaker than before, there being the same number in favor of the conclusion reached and a greater number dissenting than on the former hearing.

But they say that all this may be so; but this court has always acted to the contrary, and has twice decided this statute to be invalid. So far as the past conduct of the court is concerned, it could not *repeal* a valid statute by *disregarding it;* and as to the decisions referred to, they do not decide that the statute is invalid. They simply overrule motions made to set aside orders made granting rehearings. On what grounds we are not informed. It is

not held that the court is not bound by the statute. If the statute was unconstitutional, the point should have been decided, in order to bind the court in the future. Perhaps the court decided the motions on the same ground that is urged now, viz., that as the court had uniformly acted upon the theory that the statute was invalid, that therefore it was invalid. If so, I think the court should not hesitate to overrule those cases; but as they neither lay down a rule of law nor attempt to pass upon the construction of the statute or declare its invalidity, there would seem to be no necessity for overruling them. The only case in which this statute has been even mentioned by the court has recognized the validity of the statute, and left the question, whether the court has the inherent power to grant a rehearing, an open one. (*Hegard* v. *Cal. Ins. Co.*, 72 Cal. 535.)

The case of *Houston* v. *Williams*, 13 Cal. 24, is greatly relied upon by the appellant, but that case, when properly understood, has no bearing on the question presented here. There the statute directly affected the constitutional power and jurisdiction of the court by providing the manner in which its *decisions* should be rendered. But as I have shown, the act attempted to be regulated by the statue under consideration does not affect any right given or duty imposed upon the court by the constitution, or any act necessary to the performance of its constitutional duties or functions. The act to which the statute relates, not being a constitutional one, might not only be regulated by the legislature, but might be entirely taken away. The constitution of this state gives all legislative power *not denied* to the legislature, while that of the United States gives only such as are named. (Const., art. 6, sec. 1; *Baker* v. *City of Cincinnati*, 11 Ohio St. 534, 542.) Therefore, as a general rule, to hold a law unconstitutional, it must appear to be a plain violation of some provision contained in the constitution of this state or

.n the constitution of the United States. (Const., art. 6, sec. 1; *Hager* v. *Board of Supervisors*, 47 Cal. 222; *Baker* v. *City of Cincinnati*, 11 Ohio St. 534, 542; *Braddee* v. *Brownfield*, 2 Watts & S. 271; *Beauchamp* v. *State*, 6 Blackf. 299; *Doe* v. *Douglass*, 8 Blackf. 10; *People* v. *Gallagher*, 4 Hill, 244.) There may be exceptions to this rule, but in my opinion this case does not present one of them.

Where a court is exercising a jurisdiction conferred upon it by statutory enactment, and not by the constitution, its powers are limited by the statute by virtue of which it acts, and its powers thus conferred are subject to be limited or entirely taken away by the legislature. (*United States* v. *Knight*, 1 Black, 488.)

So it is uniformly held that the legislature of the states have full power and control over the jurisdictions of the courts so long as the statutes enacted for that purpose do not conflict with the constitution. (*Ex parte Logan Branch Bank*, 1 Ohio St. 433.)

The only authority given this court to grant a rehearing of a case decided in Bank is conferred by the section of the code under consideration, and the court snould be bound by its limitations and restrictions.

The distribution of the powers of the government into three departments—legislative, executive, and judicial—does not place either department above the law, nor make either independent of the other. (*McCauley* v. *Brooks*, 16 Cal. 10–39.)

In the case cited, Mr. Justice Field, speaking for the court, said: " The fourth article of the constitution is as follows: ' The powers of the government of the state of California shall be divided into three separate departments,—the legislative, the executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others,

except in cases hereafter expressly directed or permitted.' *There is nothing in this distribution of powers which places either department above the law, or makes either independent of the other.* It simply provides that there shall be *separate* departments, and it is only in a restricted sense that they are independent of each other. There is no such thing as absolute independence. Where discretion is vested in terms, or necessarily implied from the nature of the duties to be performed, they are independent of each other, but in no other case. Where discretion exists, the power of each is absolute; but there is no discretion where rights have vested under the constitution or by existing laws. The legislature can pass such laws as it may judge expedient, subject only to the prohibitions of the constitution. If it oversteps those limits, and attempts to impair the obligation of contracts, or to pass *ex post facto* laws, or grant special acts of incorporation for other than municipal purposes, the judiciary will set aside its legislation, and protect the rights of the assailed. Within certain limits, it is independent; when it passes over those limits, its power for good or ill is gone. The duty of the judiciary is to pronounce upon the validity of the laws passed by the legislature, to construe their language, and enforce the rights acquired thereunder. Its judgment in those matters can only be controlled by its intelligence and conscience. From the nature of its duties, its action must be free from coercion. But it is not independent of the legislature in numerous matters materially affecting its action and usefulness. The legislature fixes the places of its sessions, determines the number of its terms; and in the regulation of proceedings in civil and criminal cases, provides the manner in which suits shall be brought, prosecutions conducted, appeals taken, and all the vast machinery by which rights are asserted and wrongs redressed. In all these matters, with certain limited objections, the judiciary is a dependent department." (10 Cal. 39, 40.)

It is as much the duty of this court to respect and protect the powers of the other departments of government as it is to uphold its own, and care should be taken that under the guise of protecting the powers of the judiciary we do not trample those of the legislative department under foot.

It is right and proper that the courts should maintain and uphold their independence and freedom as a coordinate branch of the state government; but this can best be done, and the independence and usefulness of the judiciary more securely established and preserved, by a fair and liberal construction of laws enacted for its guidance, and by upholding and protecting the constitutional powers of the other departments of state while maintaining its own.

Here is a statute, plain, unambiguous, and reasonable in its terms, that takes away none of the constitutional or inherent powers of the court, that tends to the stability of its decisions, that is calculated to prevent prolonged litigation, and places no improper restraints upon the court. I know of no reason why the statute should not be upheld and enforced. The most material part of it, and that which the court might with the greatest reason have looked upon with disfavor as a limitation of its powers, viz., that five members of the court should concur in order to grant a rehearing, and that action should be taken within thirty days, have been acted upon as valid. Why should not the other requirements?

The whole of the reasoning in the prevailing opinion is outside of the real question presented. It goes to prove that the provision of the statute that five justices must concur in order to grant a rehearing is unconstitutional. There is no such question in the case. Five justices *did* vote in favor of the rehearing. If they had not, the rehearing would have been denied. The uniform practice of the court has upheld the validity of this provision of the statute and rehearings have been denied, although a majority of the court voted for them. If the

prevailing opinion is right on this point, the court has been wrong from the time the new constitution took effect until the present day. It was hardly necessary to go outside of the case to put the court in antagonism with itself by an attempt to show that it has been violating its constitutional duty, and upholding a statute that is unconstitutional for the past ten years, especially in an opinion the main force of which is based upon the practice of the court *against* the validity of another provision of the same statute.

The *real* question in the case, viz., whether the order granting a rehearing shall *be in writing and signed*, seems to have been overlooked in the zeal of an attempt to prove the court to have been wrong on a point not now before us.

I think the motion should be granted.

A petition by the respondent for a second rehearing in Bank was denied.