BROWN, J., Dissenting.
"The bald truth is this, isn’t it, that the power to regulate jurisdiction is actually a power to regulate rights—rights to judicial process . . . and substantive rights generally?” (Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic (1953) 66 Harv. L.Rev. 1362, 1371.) Henry Hart was, of course, questioning the power of Congress to restrict the jurisdiction of the federal courts in his justly famous Dialogue of almost half a century ago. Yet the principle enunciated by Professor Hart applies with even greater force to this case.
Dissenting in the Powers case (Powers v. City of Richmond (1995) 10 Cal.4th 85, 125 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (Powers)), Chief Justice Lucas gave an exhaustive account of the historical materials bearing on the question of the framers’ intent in adopting our constitutional “right of *677 appeal” provision. As that opinion compellingly demonstrates, what the framers of now article VI, section 11 of the California Constitution (hereafter article VI, section 11) intended to secure for the citizens of California was a constitutional right of direct appeal to a reviewing court, a right that included oral argument and an opinion in writing on the merits of the case. (10 Cal.4th at p. 141 [quoting Delegate Wilson at the 1879 convention that “ ‘[t]he importance of requiring the Court to give written opinions cannot be overrated. ... It tends to purity and honesty in the administration of justice.’ ([2 Willis & Stockton, Debates and Proceedings, Cal. Constitutional Convention (1878-1879)] at p. 951, col. 1.”].) Rather than confer on the Legislature the power to make exceptions to appellate jurisdiction—not just the federal model but the dominant state model of the day—the framers of the 1849 and 1879 California provisions instead expressly described the jurisdiction conferred on our appellate courts, following the example set by Louisiana. (Powers, supra, at pp. 134-137.)
Unfortunately, a plurality of the court in Powers rejected that view of the meaning of article VI, section 11—a rejection today’s majority affirms. Not only does that holding mark an epochal change in the understanding of the appellate rights of California litigants, in effect, it threatens to overturn the conception of a constitutionally rooted, truly independent judiciary. From now on, the sole limitation on the Legislature’s otherwise plenary power to manipulate the jurisdiction of California’s appellate courts is the notion that such statutory enactments may not “ ‘ “substantially impair the constitutional powers of the courts, or practically defeat their exercise.” ’ ” (Maj. opn., ante, at p. 668, quoting In re Jessup (1889) 81 Cal. 408, 470.)
The concurring opinion advances a similar but more elaborated standard to protect the appellate courts from legislative overreaching: legislation cannot constitutionally “transform[] the Court of Appeal ‘from an appellate tribunal whose duties generally involve the resolution of cases in which litigants have a direct appeal “as a matter of right” . . . into an appellate court whose jurisdiction consists entirely of writ review and as to which the court has no obligation to resolve any of the cases before it by a written decision setting forth the reasons for its ruling.’ ” (Conc. opn. of George, C. J., ante, at p. 671, quoting Powers, supra, 10 Cal.4th at p. 116, italics omitted.) Would it were so.
The tripartite structure of government and the separation of powers doctrine that underlies it are not ends in themselves; the issue is not one of governmental “turf.” The structural divisions of the Constitution are intended to promote the chief aim of our government—individual liberty. (See Miller, Liberty and Constitutional Architecture: The Rights-Structure Paradigm (1993) 16 Harv. J.L. & Pub. Pol'y 87; Brown, Separated Powers and *678 Ordered Liberty (1991) 139 U.Pa. L.Rev. 1513.) It is that concern—the potential for the impairment of individual liberty through the impairment of the structural powers of the judiciary—that is at the root of my disagreement with the majority in this case. The fear of an insensible, aggrandizing “tyranny” that underlies the structural division of government is timeless; as real today as it was in 1879, in 1849, and in 1776. And, “[c]entral to [the concept of separation of powers] are three . . . insights: (1) the very fact of the concentration of political power in the hands of one governmental organ is unacceptable, even absent a showing of misuse of that power; (2) it will, as a practical matter, be all but impossible to determine when the level of the concentration of political power has reached the danger point; and (3) the point at which such an unacceptable concentration is actually reached is too late for the situation to be remedied.” (Redish & Cisar, “If Angels Were to Govern”: The Need for Pragmatic Formalism in Separation of Powers Theory (1991) 41 Duke L.J. 449, 476, fn. omitted.)
I agree with Edmund Burke that the first virtue of politics is prudence. (See Burke, The Philosophy of Edmund Burke, Prudence as a Political Virtue (1960) p. 38; id. at p. 41 [“Prudence is not only the first in rank of the virtues political and moral, but she is the director, the regulator, the standard of them all.”].) The appetite for power by the departments of government is, as Madison wrote, “of an encroaching nature.” (Madison, The Federalist No. 48 (Rossiter ed. 1961) p. 308.) Its accretion leads to even greater accretion. Short of a coup d’état, legislative aggrandizement need not—indeed, likely will not—assume a dramatic form. More probably, as in this case, it appears in the form of legislators “eagerly bent on some favorite object, and breaking through the restraints of the Constitution in pursuit of it . . . .” (Madison, The Federalist No. 50, supra, at p. 318.) And it is for that very reason, as Thomas Jefferson wrote, that “[t]he time to guard against . . . tyranny, is before [it] shall have gotten hold on us.” (Jefferson, Notes on the State of Virginia (Peden ed. 1982) p. 121.) It is not the last invasive stroke on the judiciary’s constitutional prerogatives that should mobilize resistance, but the first. This truism of politics is the reason the limitations on legislative power endorsed in the majority and concurring opinions will protect neither the courts nor the people of California. Or, put another way, would protect them only if, in Madison’s striking phrase, “angels were to govern.” (Madison, The Federalist No. 51, supra, at p. 322.)
In my view, where the Legislature has asserted control over the right of appeal—a subject central to the judicial function—a case-by-case inquiry into the likelihood of adverse effects in the wake of a separation of powers breach is ill-conceived. It is ill-conceived for the simple reason that no effective method exists of making that inquiry until it is too late to avoid the *679 danger it represents. Indeed, for the second time in as many months, the majority continues to validate such incursions seriatim. (See In re Rose (2000) 22 Cal.4th 430, 466 [93 Cal.Rptr.2d 298, 993 P.2d 956] (dis. opn. of Brown, J.).) The idea that the court can monitor legislative inroads into our jurisdiction, calling a halt to the invasion when we have determined that it has gone “too far,” sacrifices the impairment of individual liberties to a kind of interbranch “comity.” It is for that very practical reason the separation of powers doctrine has to operate prophylactically.
Two additional considerations fuel my concern with today’s result. The majority expressly affirms the power of a reviewing court to summarily deny a disciplined physician’s writ petition—the postcard denial sent without oral argument or an opinion “in writing with reasons stated.” (See Cal. Const., art. VI, § 14.) Imposing upon the Courts of Appeal the obligation to issue alternative writs as a matter of course in cases falling within Business and Professions Code section 2337 (hereafter section 2337) would go far to mitigate the unhappy potential of today’s ruling. As it stands, however, today’s majority expressly authorizes the Court of Appeal to dismiss summarily writ petitions falling within section 2337. (See maj. opn., ante, at p. 669 [“We do not agree . . . that a Court of Appeal fails to exercise its appellate jurisdiction when it summarily denies an extraordinary writ petition that lacks substantive merit or is procedurally defective.”].) In my view, the summary denial of writ relief by the Court of Appeal denies a benefit the Constitution itself confers.
My concern is only compounded by looking at the alternatives available to the Legislature, alternatives that pose no risk to the constitutional powers of the judiciary and achieve the identical public end sought by section 2337. As Justice Mosk points out in his dissenting opinion, the simplest and most expeditious way to secure the ends sought by the Legislature is to declare that no court shall issue a stay of an administrative order revoking a medical license pending appellate review. (See dis. opn. of Mosk, J., ante, at p. 676.) Indeed, in physician misconduct cases decided under the current regime, a stay of license revocation can be issued by the Courts of Appeal only under narrowly prescribed circumstances. (See Code Civ. Proc., § 1094.5, subd. (h)(1).) Thus, in most cases, the public is fully protected against malpracticing physicians pending resolution of their appeals. The expedition promised by section 2337 is not only unnecessary, but comes at a cost in terms of constitutional structure. Last, of course, one justifiably wonders whether the promised expedition gained by eliminating the time consumed by direct appeals of disciplined physicians seeking judicial review is really any more than the time required for meaningful judicial review in a writ proceeding, including issuance of an alternative writ, additional briefing, and oral argument. (Cf. Lewis v. Superior Court (1999) 19 Cal.4th 1232 [82 Cal.Rptr.2d *680 85, 970 P.2d 872].) The necessary time expenditure can hardly be less than an expedited direct appeal.
Conclusion
The limits imposed by the Constitution—always permeable—now become wholly illusory. A rule that prohibits substantial impairment of the constitutional powers of the court (maj. opn., ante, at p. 668) is meaningless when the constitutional provisions are emptied of substantive content. The concurring opinion asserts that legislation cannot constitutionally “transform[] the Court of Appeal . . . ‘into an appellate court whose jurisdiction consists entirely of writ review ....’” (Conc. opn. of George, C. J., ante, at p. 671, italics omitted.) The Legislature may perhaps be forgiven if its derisive response is: “Sez who?”